OPINION
In November 1985, a petition was filed in Merced County Superior Court for the purpose of probating the will and codicil of Felicitas Worthy. Eventually the court ordered the will and codicil admitted to probate.
In March 1987, a petition to determine heirship was filed by Zeila Marie Cole, executrix of the estate of Felicitas Worthy. According to the petition, a devise of certain real property in Worthy's will and codicil had failed under the law of ademption because Worthy sold the designated property before her death. Ron and Patricia Kelley, who were to receive the real property pursuant to the devise, filed objections stating they were entitled to the proceeds of the sale.
After a hearing, the court denied the claim of ademption. The Dominican Sisters (hereafter Sisters), who sought to receive the proceeds of the sale under a residuary clause in the codicil, appeal.
 FACTS
We will discuss the facts as they become pertinent. In general, however, the estate has an appraised value of $247,422 and, according to the will and codicil, is subject to distribution to several heirs, including the ones before this court. The total of the bequests and creditors' claims, costs of administration, etc., may exceed the value of the assets and income. This appeal is not concerned with the payment of debts and expenses or the order of resort to assets.
 DISCUSSION (1a) The Sisters argue the court erred in refusing to accept evidence demonstrating Worthy changed her testamentary intent, and that had the court taken this change of intent into account, the Sisters would have received the proceeds of the sale of the real property as the residuary legatee. The argument assumes newly enacted article III of chapter 5 of part 1, division 6 of the Probate Code[1] is inapplicable. Therefore, the court should have allowed extrinsic evidence to determine if ademption was intended.
The will provides in pertinent part: "THIRD: I hereby make the following bequests: [¶] 1. To my brother, CHARLES ALTEMUS, that certain eighteen *Page 763 
(18) acres of land described as Merced Assessors Parcel Number 86-190-07, for and during the term of his natural life, the said CHARLES ALTEMUS to have the rents, issues and profits of said real property, and upon his death to go to RON KELLEY and PATRICIA KELLEY, my Godchild, of Oxnard, California; . . ."
The codicil, dated almost four years later, provides in pertinent part: "As stated in the original will eighteen acres Parcel #86-190-07 was willed to Charles Altemus, brother and if his death preceeds [sic] mine to Ron and Patricia Kelley.
". . . . . . . . . . . . . . . . . . . .
"If there is a reasonable substantial amount left I will it to the Dominican Sisters of San Rafael in the name of my blood Sister M. Andrew. . . ."
Apparently witnesses were available who would testify the property in question was sold by Worthy for the purpose of paying the costs of ongoing medical care. Counsel successfully offered in evidence the escrow instructions and the individual grant deed, both dated October 17, 1985. According to the instructions, the transaction was to be completed within two weeks, which would have preceded Worthy's death on November 18, 1985. However, for unexplained "technical" reasons, the escrow closed three days after her death.
The rationale behind the court's ruling was consistent throughout. The following quotation from the record is illustrative: "THE COURT: But as of the time of the closing of the escrow, the property was still in the name of the testator. That is, at the time of the date of death, the property was still; and so they took the real property as of the date of death; but there was a contract for its sale.
"And so they took it subject to the rights of the purchaser, or the transferee, to complete the sale. And thus three days later, it was converted to money, and so they took property.
"Had the death date been just the reverse, had the date of death been three days after the close, I think you'd be right. But when the date of death is three days after the close, it appears to the Court that the real property was still in existence as of that date, subject to the agreement to sell.
"And that right of the buyer are [sic], of course, to have the sale completed; and they don't have to go through a suit in order to do that. The escrow is there; the agreement is made. *Page 764 
"Now, I can't see any difference. As I say, I can see a difference between the reverse situation. But I can't — I can't for the life of me see how it's converted to personal property before the date of the death where the decedent dies before the close of escrow."
As they do in this court, Sisters placed great significance in the fact the escrow closed so soon after Worthy's death, and in fact would have closed earlier but for unexpected problems. This closeness in time, coupled with evidence they believed would establish Worthy's intent to use the sale proceeds during her lifetime to pay anticipated medical expenses, should have been sufficient to undo the rules of interpretation applied by the trial court.
Section 6165 provides: "The rules of construction in this article [article III] apply where the intention of the testator is not indicated by the will." (Italics added.)
Section 6175 provides: "If the testator after execution of the will enters into an agreement for the sale or transfer of specifically devised property, the specific devisee has the right to the property subject to the remedies of the purchaser or transferee."
Surprisingly, we are not also cited to section 6172, which provides, in pertinent part: "A specific devisee has the right to the remaining specifically devised property and all of the following: [¶] (a) Any balance of the purchase price (together with any security interest) owing from a purchaser to the testator at death by reason of sale of the property."
(2a) Sisters argue these sections are inapplicable because the testator did indicate her intent in her will and codicil. In making this argument, they look to the early version of section 100, which was replaced by section 6165. The early version of section 100 provided: "The interpretation of wills, whenever made, is governed, when relating to property within this state, by the law of this state, and the rules prescribed by this code are to be observed, unless an intention to the contrary clearly appears."
(3) Sisters emphasize the use of the word "clearly" in section 100. The argument is made that when comparing section 6175 with the now replaced section 100, Sisters need not make a "clear" showing of intent as previously required by section 100, but need only make a showing the will "indicated" the intention of Worthy. If this intention was "indicated," article III would not apply. What follows, of course, is an analysis of the will and codicil which attempts to support this conclusion.
By creating a residuary clause in the codicil, Sisters argue Worthy more than "indicated" an intent to avoid intestacy and to provide for disposition *Page 765 
of assets on a strict ademption basis. We are asked to use this case to establish a test for "indicated" under these amendments to the code.
They argue, without citation to authority, that in the context of ademption, it is difficult to conceive of a more direct indication of testamentary intent than a residuary clause. Other forms of contrary intent would require the incorporation of self-cancelling, and probably confusing, language regarding the gift. On the other hand, a residuary provision, by implication, simply provides the basis for determining the testator meant to adeem or abate the gift by way of subsequent action, word, or deed. In such cases, the testator's intent has been indicated, and the intent is that such actions, words or deeds can, in the appropriate case, modify or adeem the specific gift. We disagree.
Sisters' reasoning in this argument misses the point. First, as for the assertion the Legislature created a new standard by way of the 1983 amendments, such an argument must fail if section 6178 is properly considered. It provides: "The rules stated in Sections 6172 to 6177, inclusive, are not exhaustive, and nothing in those sections is intended to increase the incidence of ademption under the law of this state." Surely, if the Legislature intended a lower standard of proof to establish the testator's intent in the will, and thereby preclude application of article III in many cases, it would have done so: such a change would increase the incidence of ademption, rather than let it remain constant as intended. (See § 6178.)
The comments of the California Law Revision Commission are also helpful on this point: "Under existing law, if a will makes a gift of specific property and the property no longer exists at the testator's death or is no longer a part of the estate, the gift is said to be `adeemed' (revoked). No monetary equivalent is substituted for the gift, with the result that the testamentary provision is nullified.
"Because of the harsh effects of ademption, the California courts have sought to avoid ademption whenever possible by applying various constructional rules. In addition, several statutes state special rules that save a testamentary gift from ademption.
"The Uniform Probate Code identifies a number of other special situations where a specific gift should not be adeemed. This is where a stock split, merger, or the like, alters the character of the securities given, where there are unpaid proceeds of sale, condemnation, or insurance on damaged or destroyed property that was devised, or where a secured note given by will has been foreclosed and the property used as security is in the testator's estate as a result of the foreclosure. The proposed law adds these Uniform *Page 766 
Probate Code rules of nonademption to the existing California statutes. The Uniform Probate Code rules deal with matters not covered by California statute and are generally consistent with California decisional law.
"To the extent California decisional law has not dealt with all these matters, the provisions will clear up uncertainties and provide useful rules." (16 Cal. Law Revision Com. Rep. (Nov. 1982) pp. 2329-2331, fns. omitted.)
We therefore conclude the first prong of the argument must fail because the Legislature did not intend the showing of testamentary intent under section 6165 to be any more or less than was required under original section 100.
(2b) Applying the same standard of proof of testamentary intent required under the earlier version of the Probate Code, we must now deal with Sisters' arguments that a continuing testamentary intent was indicated in the residuary clause of the codicil.
In Estate of Newsome (1967) 248 Cal.App.2d 712, 714 [56 Cal.Rptr. 874], the court made the following statement: "Ademption is one of the ways in which a devise or bequest lapses [citation]; is the extinction or withdrawal of the gift by some act of the testator clearly indicating an intent to revoke such; may be effected, as to a specific devise or bequest, by the testator's disposition of the property devised or bequeathed and attendant circumstances which prevent it, or its identifiable proceeds from passing by the will, from which an intention that the gift shall fail is presumed; but is not effected by a mere change in the form of the property through its disposition by the testator `in the absence of proof that the testator intended that the gift fail.' [Citations.] It is settled in California that whether an ademption occurs depends upon the intention of the testator that the devise or bequest should fail. [Citations.] The intention may be ascertained from the provisions of the will. [Citation.] Where there is no residuary clause therein it may be inferred the testator intended to dispose of all of his estate through the specified devises and bequests and not to cause any thereof to fail by his transmutation of the property devised or bequeathed. [Citations.]"
Based upon Newsome and other cases, it is argued that if a lack of a residuary clause implies a desire against ademption, then the opposite conclusion must be drawn when there is a residuary clause. Again, we disagree. As the previously quoted comment of the California Law Revision Commission indicated, California courts have "sought to avoid ademption whenever possible." If a will has no residuary clause, partial intestacy may result because of an unforeseen change of circumstances. Courts have found it appropriate to resort to rules of construction based upon the assumption *Page 767 
the testator intended to avoid intestacy. Therefore, at times courts simply implied an intent to give the identifiable proceeds of a designated asset to the named heir, thereby avoiding partial intestacy.
Because courts sometimes used a particular judicially created rule of construction to avoid intestacy does not mean the reverse of such reasoning must apply when resolving disputes between named devisees and residuary heirs. When there is no question of intestacy, the reason for the presumed intent is missing, leaving the courts to look for other rules of construction — with proper respect for statutory ones — in order to ascertain the testator's intent. We find nothing in the California cases indicating the mere presence of a residuary clause compels the court to find a presumed ademption. Neither do we find a commonly followed black-letter rule which has always been followed in these cases.
It takes little time in reading the cases cited to us by counsel to become frustrated, and to be reminded of the limited value of precedent in this aspect of probate law. As Witkin observed in 7 Witkin, Summary of California Law (8th ed. 1974) Wills and Probate, section 159, pages 5675-5676: "In cases dealing with interpretation of wills, as in other controversies, counsel and courts draw freely upon the enormous volume of reported decisions. But in ascertaining the intention of a particular testator decisions in other cases are seldom controlling. `Of this class of questions it may be said, with more truth, perhaps, than of any other, that each case depends upon its own peculiar facts, and that precedents have comparatively small value.' (Estate of Henderson (1911) 161 C. 353, 357, 119 P. 496; see also Estate of Wilson, supra, 184 C. 67; Estate of Keller, supra, 134 C.A.2d 238 [`no two wills are exactly alike and but few are sufficiently similar in the wording of dispository provisions so that a decision interpreting one would be of any great help in interpreting another'].)"
(4) Before the execution of the Worthy will, the Legislature adopted portions of the Uniform Probate Code. Sections 6165-6178 modify prior statutory and judicial rules of construction concerning exoneration and ademption. In some cases the prior rule is "reversed." (See § 6170.) The obvious purpose of the amendments is to provide certainty when the testator has not done so.
Former section 100 introduced the subject by requiring wills be interpreted according to certain rules "unless an intention to the contrary clearly appears." As would be expected, allowing proof of a contrary intent opens the door to controversy. Arguably, the intent at issue should be found in the words of the testator as expressed in the will. Equally compelling was the contention the testator's more likely intent in a case of this kind could be *Page 768 
found in the circumstances surrounding the postwill-execution disposition of the devised property. In California, this latter view prevailed. The emphasis would be on the testator's intent at the time the property was alienated. (Estate of Mason (1965)62 Cal.2d 213 [42 Cal.Rptr. 13, 397 P.2d 1005]; Estate of Holmes
(1965) 233 Cal.App.2d 464 [43 Cal.Rptr. 693].) This latter view survived in California at least until 1985, even though it opened the door to the taking of sometimes unreliable evidence of the testator's intent. Obviously, it might be difficult to refute or explain such evidence.
By the 1985 enactment of section 6165, a different focus emerged. Henceforth, there is a clear mandate: "The rules of construction in this article apply where the intention of the testator is not indicated by the will." (Italics added.) The last three words limit the scope of inquiry. If the testator fails to anticipate future changes in the assets given to particular beneficiaries, and therefore fails to spell out in the will how such changes affect the gifts, the law will determine the result by resort to these sections of the code.
We look to the effect of these sections without the benefit of California precedent. However, similar portions of the Uniform Probate Code adopted in other states have been reviewed; the results are helpful.
In Owen v. Wilson (Fla.App. 1981) 399 So.2d 498, the appellate court observed that the state ademption statutes had been modified by the enactment of new probate provisions to make them similar to those of sister states. (Id. at p. 500.) The state's preamended version of the Probate Code subscribed to the "intention theory" of ademption whereby the court looked to the postwill-execution actions of the testator to determine the testator's intent. (Ibid.; see also Eisenschenk v. Fowler
(Fla. 1955) 82 So.2d 876, 878.) The court found the modified section of the Probate Code applied, regardless of such subsequently evidenced intent. This broad statement was clarified a few months later. (See In re Estate of Jones (Fla.App. 1985)472 So.2d 1299.)
In Jones, the court cited Owen for the rule that if one of the new sections applies to the facts before the court, proof of intent after execution of the will is irrelevant. However, the court found no indication the state legislature had intended to supplant Florida case law in those instances not covered by the new sections. The court then found no section applicable to the facts before it. As a result, the judicial "intention theory" of ademption could be applied. Citing the California case of Estateof Austin (1980) 113 Cal.App.3d 167 [169 Cal.Rptr. 648] as instructive on the relevance of *Page 769 
intent, the court reversed the order of ademption because the trial court had refused to hear relevant postwill-execution evidence of the testator's intent.
The Supreme Court of Nebraska reviewed a case involving facts somewhat similar to those before us. In In re Estate of McClow
(1980) 205 Neb. 739 [290 N.W.2d 186], the testatrix specifically devised certain property, but after executing her will, sold the property under a contract of sale. By the time of her death, the contract had been paid in part. On appeal, the court applied the Nebraska statute, which is similar to our new section 6172. Ademption was held to apply only as to the part of the sale price received prior to the death of the testatrix.
We agree with the conclusions of our sister state courts inasmuch as the new ademption sections are intended to control when the facts of the case make them applicable. If inapplicable, the former case law applies. (1b), (2c) Here, the trial court correctly concluded the incomplete sale did not cause an ademption since the will failed to so provide. Instead, the pertinent sections specifically protecting the devisees' interest in the property, and right to the proceeds when and if received, applied. Evidence of the reasons for the sale was therefore irrelevant. We also add our view that the offered evidence was, in any event, of no consequence. It merely suggested a reason for the sale, not an intent to effect an ademption irrespective of how much of the proceeds would be received and used. Therefore, under either the application of the ademption statutes, or simple relevance rules, the rejection of the evidence was proper.
The judgment is affirmed. Respondents are awarded costs on appeal.
Ardaiz, J., and Sarkisian, J.,* concurred.
[1] All statutory references are to the Probate Code unless otherwise indicated.
* Assigned by the Chairperson of the Judicial Council. *Page 770