[No. B195803. Second Dist., Div. Five. Dec. 5, 2007.]

LORRIN BROWN, Plaintiff and Appellant, v.
FRUMEH LABOW et al., Defendants and Respondents.

## Counsel

Plotkin, Marutani & Kaufman, Jay J. Plotkin and Warren W. Kaufman for Plaintiff and Appellant.

Bloom & Ruttenberg and Gary M. Ruttenberg for Defendant and Respondent Frumeh Labow.

Ervin Cohen & Jessup and Reeve E. Chudd for Defendant and Respondent Evelyn Joseph.

Tyre Kamins Katz & Granof and Leah K. Phillips Falzone for Defendant and Respondent Ross G. Brown.

**OPINION**

**TURNER, P. J.—**

## I. INTRODUCTION

Lorrin Brown[1] challenges two orders. First, Mr. Brown challenges an order dismissing a petition which sought a determination that the liquidation and dissolution of Brown Wholesale Electric Supply Company (Brown Wholesale Electric) did not cause an ademption of the specific gifts of its stock. The stock was contained in the Rubin Brown Living Trust (the trust) under the tenth amendment to the trust (dated Oct. 13, 1995). Second, Mr. Brown appeals from a probate court order quashing acceptance of a settlement offer pursuant to Code of Civil Procedure section 998. We reverse the order dismissing a petition which sought a determination that the liquidation and dissolution of Brown Wholesale Electric did not cause an ademption. Also, we affirm the order quashing acceptance of the statutory offer to compromise.

## II. BACKGROUND

Rubin created the trust on February 14, 1983, and named himself as trustee. The principal asset of the trust was 95 percent ownership of stock in Brown Wholesale Electric. Rubin had two sons, Mr. Brown and Ross, both of whom worked for Brown Wholesale Electric. Mr. Brown and Ross were also officers, directors, and minority shareholders of Brown Wholesale Electric. Over time, Rubin executed 12 amendments to the trust. The ninth amendment dated March 21, 1994, gave 30 percent of the stock to Mr. Brown and 70 percent to Ross. In the tenth amendment, dated October 13, 1995, to the trust, Rubin reduced Mr. Brown's gift to 10 percent of the stock and increased Ross's gift to 90 percent of the stock. Ross is the sole residuary beneficiary of the trust.

Paragraph 6.01 of the tenth amendment to the trust provides in part: "SPECIFIC GIFTS As soon as administratively possible following the death of Trustor, Trustee shall distribute the following gifts: [¶] . . . [¶] (c) Trustor's interest in ownership of the preferred and common stock of Brown Wholesale Electric Company shall be allocated and distributed outright to Trustor's two (2) sons, with ten percent (10%) thereof allocated and distributed to LORRIN C. BROWN, and ninety percent (90%) thereof allocated and

---

[1] This case involves three individuals with the surname Brown: Lorrin, Ross, and Rubin. For purposes of clarity we will refer to Lorrin as Mr. Brown and Ross and Rubin by their first names. We refer to Ross and Rubin by their first names for clarity and not out of any disrespect.

distributed to ROSS G. BROWN. In the event either such beneficiary shall not survive to the date of distribution, such beneficiary's share shall be added to the residue of the Trust Estate and distributed pursuant to Paragraph 6.02 below."

On July 25, 1996, Ross filed a petition for the appointment of a conservator of the person and estate of Rubin. On September 9, 1996, Frumeh Labow was appointed conservator of Rubin's person and estate. On October 16, 1996, Ms. Labow filed a petition to have herself appointed as successor trustee. Ms. Labow asserted that Rubin could no longer serve as trustee and the named successor trustees declined to accept the appointment. The October 16, 1996, petition alleged Rubin "is unable to handle his own personal care and his own financial affairs and cannot act in any fiduciary capacity." The trust assets consisted of Rubin's residence and his shares in Brown Wholesale Electric; the value of the entire corporation was in excess of $18 million; and no bond was required because there were no cash or other liquid assets. Ms. Labow requested, "[In] lieu of bond the court order that said stock shall not be assigned, transferred, alienated, or encumbered without [a court order] . . . and that a legend describing such restriction be prominently imprinted on the certificates evidencing such stock held by the [trust]." In a supplemental petition filed November 25, 1996, Ms. Labow advised the court that the successor trustees, Benjamin Felton and First Interstate Bank, refused to serve due to substantial litigation over the conservatorship, as well as assets of the living trust which had been designated as charitable remainder trusts by Rubin. On December 4, 1996, the probate court appointed Ms. Labow as the successor trustee of the trust as restated in the ninth amendment dated March 21, 1994. The December 4, 1996, order provides that Ms. Labow is not required to file a bond; the stock could not be transferred without a prior court order; and a legend stating the restriction should appear on the stock.

On January 9, 2001, Ms. Labow filed a first account current and report of successor trustee. Ms. Labow also requested the settlement of accounts and payment of fees; an increase in bond to $14,350,000; a release and substitution of surety; and for the authority to make interim monthly payments to trustee. Ms. Labow reported the trust had income of $13,954,848.04 during the reporting period; the charitable remainder trust litigation had been settled and approved by the probate court; the business (of which the conservatee, Rubin, owned 95.94 percent of the stock) was subsequently sold for $24 million; and the payments were made to the conservatorship estate and then transferred to the trust. According to Ms. Labow's account and report as trustee, "The 95.54% interest of the stock in Brown Wholesale Electric Company owned by the within Trust and recovered for the benefit of the Trust and Trustor has been valued at [$23,221,895.02], which represents the value after the sale of the assets, the payment of corporate debts, and the

receipt of liquidating dividends." On March 6, 2001, the probate court issued an order settling the first account current and report of Ms. Labow and granting the petition as requested.

On April 9, 2003, Ross and Mr. Brown filed an ex parte application to instruct Ms. Labow to distribute the sums of $200,000 and $100,000 to them respectively once in 2003 and again in 2004 if their father, Rubin, was still alive. The application was based on evidence that Rubin's assets in the trust were valued in excess of $10 million and gifts had been made to others including Evelyn Joseph, his longtime companion. The brothers argued that their father valued tax-efficient transfer of the assets and the distribution would be consistent with his wishes. They also argued that Ms. Labow did not oppose the distribution. Ms. Labow declared a gift of the $25,000 to Rubin's niece, Sandy Wolf, had already been made; Rubin's living expenses were less than his annual income and would remain constant for the rest of his life; and there were sufficient assets in the trust to satisfy the gifts to Ms. Joseph. On April 9, 2003, the probate court instructed the trustee to make the $200,000 and $100,000 distributions to Ross and Mr. Brown.

On November 10, 2005, Mr. Brown filed an amended petition to set aside the tenth amendment to the trust; for determination of nonademption of a specific gift of stock under the trust; and for removal of Ms. Labow as successor trustee. On the first day of trial, Mr. Brown abandoned his challenge to the validity of the tenth amendment to the trust. The November 10, 2005, amended petition alleged that Rubin died on November 3, 2004. The amended petition further alleged Mr. Brown was a beneficiary of a specific gift of the trust originally dated February 14, 1983, and restated on March 21, 1994; Rubin executed a tenth amendment to the trust on October 13, 1995, the eleventh amendment to the trust on January 3, 1996, and the twelfth amendment to the trust on April 3, 1996; Rubin was declared incapacitated and under a conservatorship of his person and estate from July 25, 1996, until his death; and as a result of his incapacity, the eleventh and twelfth amendments to the trust were revoked by court order on November 19, 1997. It was alleged that the main asset of the trust was the stock of Brown Wholesale Electric which was sold by the conservator and successor trustee, Ms. Labow, in January 1998. On January 2, 1998, Ms. Labow while acting as secretary of Brown Wholesale Electric with Ross acting as president executed a certificate of election to wind up and dissolve the corporation. A fourth account filed with the probate court on November 18, 2004, valued the trust assets at $11 million. Mr. Brown contended that sale of the stock changed the intent of the ninth amendment to the trust which gifted 30 percent of the Brown Wholesale Electric stock to him. Citing Probate Code[2] section 21134 and *Estate of Packham* (1965) 232 Cal.App.2d 847, 849 [43

---

[2] All further statutory references are to the Probate Code unless otherwise indicated.

Cal.Rptr. 318], Mr. Brown asserted that there had not been an ademption of the specific gift of stock to him which occurred during the conservatorship.

Mr. Brown also requested that Ms. Labow be removed as trustee. Mr. Brown argued that Ms. Labow violated her duties to avoid conflict and to deal impartially with the beneficiaries of the trust. Mr. Brown contended Ms. Labow violated the loyalty duty by violating the December 4, 1996, order not to sell the stock without prior permission of the probate order; Ms. Labow had decimated the specific stock gift to him; Ms. Labow reallocated millions of dollars to Ross, the remainder beneficiary; as a minority shareholder he was not afforded the opportunity to oppose the liquidation or the consequences to the shift of his specific gift to the remainder of the trust estate; and that Ms. Labow be surcharged.

Ms. Labow responded to Mr. Brown's amended petition as follows. Ms. Labow argued that Ross and Ms. Joseph were major beneficiaries of the trust; Mr. Brown's interest was comparably smaller being 30 percent under the ninth amendment or 10 percent under the tenth amendment; and shares of stock in Brown Wholesale Electric were owned by the trust and thus were under the management and control of the trustee. Ms. Labow contended that she never sold the shares of stock of Brown Wholesale Electric in any capacity including as conservator or as a successor trustee of the trust. Ms. Labow asserted that the assets of Brown Wholesale Electric were sold in 1998 pursuant to an agreement negotiated and approved by its board of directors. The board consisted of Ross, Mr. Brown, and Ray Sullivan. Ms. Labow further contended that the asset sale of Brown Wholesale Electric (as opposed to a stock sale) was at the direction of Rubin and with his full knowledge. (It bears emphasis in 1998, Rubin was the subject of the September 9, 1996, probate conservatorship order. Rubin was never declared competent prior to his death in November 2004.) Four years after the assets were sold, Brown Wholesale Electric was liquidated and dissolved.

Ms. Labow contended that section 21134 does not apply to this case because the express language of the statute limited its application to sales by a *conservator*. According to Ms. Labow, section 21134 is inapplicable because there was no sale; her participation in the asset sale of Brown Wholesale Electric was as the trustee of the trust and as a secondary officer of the corporation; section 21134 does not apply to trusts; the nonademption statutes in section 21101 et seq. and specifically, section 21134, have no application to trust law which has no provision on the subject; the holding of *Estate of Packham, supra*, 232 Cal.App.2d at page 847, predates California's conformity to the Uniform Probate Code; and *Estate of Packham* only applies in cases where there is a guardianship.

Ms. Labow asserted an ademption occurred because Rubin, who objected to the conservatorship, clearly expressed an intent to sell Brown Wholesale Electric and retire; Rubin had shown an intent to decrease Mr. Brown's interest in the stock of Brown Wholesale Electric with the ninth and tenth amendments to the trust in favor of Ms. Joseph (by increasing her gift) and Ross (by increasing his share of the stock and making him the sole residual beneficiary of the trust); and the 2003 and 2004 distributions to Ross and Mr. Brown do not conclusively demonstrate an intent of nonademption but merely established the brothers failed disclose to the probate court the existence of the tenth amendment to the trust.

Ms. Labow argued that she should not be removed as the trustee because she is a registered professional conservator and fiduciary. Ms. Labow denied that she had breached her fiduciary duties under section 16002, 16003, or 16006. Ms. Labow asserted the trust was revocable; pursuant to section 15800, in her capacity as a trustee her sole duty was to benefit Rubin; as trustee, she impartially administered the trust in the best interests of all persons and preserved all trust property; as trustee, she did not assign, transfer, alienate, or encumber the stock in Brown Wholesale Electric but voted to sell the assets and dissolve the corporation; Mr. Brown participated as an officer, director, and shareholder in the sale of the corporation's assets; as trustee, Ms. Labow recovered the value of the conservatee's stock for the inter vivos trust as liquidating dividends; as trustee, Ms. Labow reported the sale and liquidation to the probate court in January 2001; the probate court approved the sale of assets and liquidation in March 2001; as trustee, Ms. Labow did not violate any court order and reported her activities to the probate court which approved and confirmed her action; and Mr. Brown did not suffer any losses or damages requiring a surcharge.

On June 13, 2006, the probate court issued an order quashing the acceptance by Mr. Brown of Ross's Code of Civil Procedure section 998 statutory compromise offer. The circumstances of this controversy arose after Ross and Ms. Joseph jointly served Mr. Brown with a statutory compromise offer on March 8, 2006. The offer provided for a $500,000 payment free of estate taxes in consideration for a dismissal with prejudice of all petitions, including actions against Ms. Labow; a stipulation as to the validity of the tenth amendment to the trust and the ademption of the specific gift of stock; a full release of all parties and their attorneys from liability; and each party bearing its own costs and fees. The statutory settlement offer was set to expire on March 10, 2006. According to William W. Holcomb, counsel for Ross, Katerina Smith, Mr. Brown's attorney, made certain oral counterproposals. Mr. Holcomb declared that, on March 23 and 27, 2006, he spoke to Ms. Smith by telephone. Mr. Holcomb advised Ms. Smith that Ross would not accept the counterproposals. Mr. Holcomb further declared that he spoke with Ms. Smith twice by telephone on March 30, 2006, for almost an hour.

During those conversations, Mr. Holcomb advised Ms. Smith that Ross no longer agreed to the terms contained in the statutory settlement offer. Mr. Holcomb explained that the statutory settlement offer was void. Mr. Holcomb advised Ms. Smith that Ross would only settle the lawsuit if Mr. Brown agreed to a global settlement containing new terms which were not in the statutory offer. Ms. Smith agreed to talk to Mr. Brown. On April 6, 2006, Mr. Brown sent a written acceptance of the offer by letter to Mr. Holcomb, which had been filed with the court. On April 13, 2006, Ross filed an ex parte application to quash acceptance of the offer. The probate court granted Ross's motion to quash the acceptance of the statutory settlement offer on May 9, 2006. On June 23, 2006, Mr. Brown filed a mandate petition challenging the probate court's May 9, 2006, order. The petition was denied on June 30, 2006. (*Brown v. Superior Court* (June 30, 2006, B191867) [nonpub. order].)

## A. Testimony

Ms. Labow testified that, after she was appointed conservator, Rubin remained incompetent until his death. Ms. Labow believed Rubin was not competent to handle his financial affairs. Ms. Labow testified that she and Rubin had a conversation where he affirmed his desire to sell the business so he "could enjoy life." According to Ms. Labow, Rubin told her that the desire to sell had existed prior to the institution of the conservatorship. Rubin also told Ms. Labow the plan to sell had been started prior to the sale. Ms. Labow believed Rubin "maintained the capacity to be able to tell [her] an overall direction" in terms of the business. Ms. Labow did not differ with Rubin on the sale because it seemed logical. In response to a deposition question concerning the eleventh and twelfth amendments to the trust which the trustee sought to set aside, Ms. Labow testified that she did not consult Rubin about the amendments. According to Ms. Labow: "Without being rude to Rubin, you don't ask the loon whether you should do something. I had already come to the conclusion that Rubin didn't know what he was doing." Ms. Labow also testified at her deposition that when she voted the shares of trust concerning the election to wind up and dissolve Brown Wholesale Electric, she was acting as the conservator and not the trustee. Ms. Labow testified that she did not recall whether she was the trustee in January 1998. Ms. Labow testified: "I mean to be honest I don't differentiate greatly between my role as conservator and my role as trustee . . . ." At trial, Ms. Labow testified that she voted the shares as the trustee because she would not have had the right to do so as the conservator. Ms. Labow understood her duties were to carry out Rubin's intent as expressed in the original trust and as amended by the ninth and tenth amendments.

Ross testified that he has been an inactive member of the State Bar since 1970. In 1995, Ross managed the three Hawaii branches of Brown Wholesale Electric. In 1996, sometime after Rubin had a stroke, Ross returned from Hawaii. Ross became concerned that Rubin was making decisions which were not in the best interests of Brown Wholesale Electric. Brown Wholesale Electric was Rubin's "number one" priority. Rubin's questionable decisions caused Ross to file the petition to institute a conservatorship. Ross served as conservator until Ms. Labow was appointed in that capacity. Nothing occurred after the petition was filed to change Ross's opinion as to the propriety of instituting conservatorship proceedings. The conservatorship remained in place until Rubin's death. After the conservatorship was in place, Ross was the president and chief executive office and a minority shareholder of Brown Wholesale Electric. Ross continued to run Brown Wholesale Electric at Ms. Labow's request after she was appointed conservator. Although Ross was a board member, he never attended any board meetings. This was because there were never any board meetings to attend. The corporate minutes reflect that in 1994, Rubin was authorized to sell Brown Wholesale Electric. Ross signed the minutes but did not remember that he had done so. Ross did not know what Rubin's intentions were prior to July 25, 1996, the date the conservator petition was filed, about selling Brown Wholesale Electric. In July 1996, Ross obtained information from a third party that Rubin was about to sell Brown Wholesale Electric or buy another business. When deposed, Ross testified that Rubin had been considering selling Brown Wholesale Electric. When asked the basis for his deposition testimony, Ross testified, "What the attorney told me." Immediately after his deposition testimony was read at trial, Ross was asked, "So the only basis for your knowledge then in that regard of what your father wanted to do is something an attorney told you; right?" Ross responded, "Only in the case of selling the business."

After the conservatorship was in place, Ross and Rubin had discussions about selling Brown Wholesale Electric. Rubin wanted Ross to sell Brown Wholesale Electric so that Rubin could enjoy the fruits of his labor. Rubin did not tell Ross to sell the assets of Brown Wholesale Electric as opposed to selling the stock or any variation of such a potential transaction. Ross did not learn about the tenth amendment to the trust until the present litigation commenced in 2005. However, Ross admitted that he signed a declaration in February 2002. Ross's declaration admitted that the tenth amendment to the trust called for a specific 10 percent stock gift to Mr. Brown. Ross stated that Rubin never discussed anything about the trust. Nor did Rubin discuss any personal matters with Ross.

The terms of the asset sale of the corporation were negotiated by Ross in 1997. The buyers dictated the terms of the asset-only sale. The sale took

place in 1998 and the windup of Brown Wholesale Electric was completed in 2003 or 2004. According to Ross, Ms. Labow wore "two hats," conservator and trustee. Ross testified: "The decision to sell the business had nothing to do with the conservatorship. It had to do with the trusteeship because that was the thing my dad wanted, to sell the business. And so I agreed to sell the business because that what my dad wanted."

### B.  The Probate Court's Decision

In the statement of decision, the probate court found that the tenth amendment was a "valid document." The probate court ruled the stock gifts were adeemed. The ademption occurred because there was a distribution after the corporation was dissolved and liquidated but before Rubin's death within the meaning of sections 21132 and 21133. The probate court also ruled section 21134 does not apply to this case because Ms. Labow did not participate in the sale of the assets of Brown Wholesale Electric as a conservator; the stock was not owned by Rubin but was owned by the trust; Ms. Labow participated in the asset sale as a trustee; and neither the Uniform Probate Code nor the Uniform Trust Code provides an exception to ademption caused by a trustee.

The probate court also found that Ms. Labow had not breached a fiduciary duty as trustee and should not be removed; Ms. Labow's duties as the trustee of a revocable trust were controlled by section 15800 and were owed solely to the conservatee, Rubin; Ms. Labow acted reasonably and in good faith as a trustee (§ 16440, subd. (b)); and Ms. Labow's actions were reasonable. As evidence of Ms. Labow's reasonableness, the probate court cited: the asset sale, liquidation, and dissolution of the corporation were in compliance with California law; Mr. Brown signed the documents related to the transactions; she was concerned with litigation over gifts which had been made to the University of California at Los Angeles under the eleventh and twelfth amendments to the trust; she needed money to resolve the litigation and to provide for Rubin's care during his lifetime; and she consulted with managers and other professionals. The probate court also found pursuant to section 2580 Ms. Labow did not have a duty as a conservator and could not be held liable for her failure to propose any actions pertaining to the doctrine of substituted judgment.

The probate court entered its order concurrently with the statement of decision. This timely appeal followed.

## III. DISCUSSION

### A. Introduction

This case concerns the loss of a specific gift of stock to a beneficiary of a revocable trust after the trustor was declared incompetent. The primary asset of the trust was 95 percent ownership of the stock of Brown Wholesale Electric. The matter is more complicated because the loss of the gift resulted from an asset sale as opposed to a stock sale of a closely held corporation. The asset sale followed by a dissolution of the corporation as opposed to an outright stock sale resulted in the dissipation of the value of stock at the time of Rubin's death. It is undisputed that the stock was the primary asset of the conservatorship estate. Ms. Labow was also appointed as successor trustee of the revocable trust after she had been appointed Rubin's conservator. Ms. Labow, while acting as trustee and an officer and director of Brown Wholesale Electric, participated in the asset sale, which resulted in the loss of stock value by the time of Rubin's death. Although the issues were litigated in the probate court, in his briefs on appeal, Mr. Brown has not asserted that Ms. Labow should be removed as the trustee or should be surcharged for any conduct. Thus, any arguments in that regard have been waived. (*Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4 [188 Cal.Rptr. 115, 655 P.2d 317]; *Johnston v. Board of Supervisors* (1947) 31 Cal.2d 66, 70 [187 P.2d 686], disapproved on another point in *Bailey v. County of Los Angeles* (1956) 46 Cal.2d 132, 139 [293 P.2d 449].)

### B. The Ademption Issue

In *Estate of Mason* (1965) 62 Cal.2d 213, 215 [42 Cal.Rptr. 13, 397 P.2d 1005], the California Supreme Court explained an ademption as follows: " ' "Ademption of a specific legacy is the extinction or withdrawal of a legacy in consequence of some act of the testator equivalent to its revocation, or clearly indicative of an intention to revoke. The ademption is effected by the extinction of the thing or fund bequeathed, or by a disposition of it subsequent to the will which prevents its passing by the will from which an intention that the legacy should fail is presumed." ' [Citations.]" (See also *Estate of Resler* (1954) 43 Cal.2d 726, 735–736 [278 P.2d 1]; *Estate of Creed* (1967) 255 Cal.App.2d 80, 83–84 [63 Cal.Rptr. 80].) Section 21134, subdivision (a) states, "Except as otherwise provided in this section, if after the execution of the instrument of gift specifically given property is sold or mortgaged by a conservator or by an agent acting within the authority of a durable power of attorney for an incapacitated principal, the transferee of the specific gift has the right to a general pecuniary gift equal to the net sale price of, or the amount of the unpaid loan on, the property."

Ms. Labow, Ms. Joseph, and Ross contend that section 21134 is inapplicable to this case. Their argument is as follows. In their view, section 21134 is relevant only when there is a sale of the specific gift by a *conservator* but not a trustee. An ademption occurred in this case because there was no sale of stock by Ms. Labow in her capacity as conservator; rather, there was an asset sale by Ms. Labow in her capacity as trustee of an inter vivos trust. Ms. Labow, Ms. Joseph, and Ross acknowledge section 21134 prohibits a conservator from causing an ademption. But they argue no comparable statutory trust provision prevents a trustee from causing an ademption of an incompetent person's specific gift. For the reasons stated below, we disagree with the contention of Ms. Labow, Ms. Joseph, and Ross no ademption occurred in that there was no sale by a conservator but merely an asset sale by a trustee. Rather, we conclude that no ademption occurred in this case because there was only a change in form and there was no substantial evidence that Rubin intended for the gift to Mr. Brown to fail. Our decision is premised on controlling California Supreme Court authority, *Estate of Mason, supra,* 62 Cal.2d at pages 215–216, and its progeny, which have not been statutorily abrogated.

We begin by analyzing California ademption law as it has developed since January 1965. California decisional authority regarding ademption of specific gifts of incapacitated persons evolved in the context of adult guardianship proceedings. In 1979, the Legislature converted all adult guardianships into conservatorships. (Stats. 1979, ch. 726, § 3, p. 2341; former § 1485.) The rationale of replacing adult guardianships with conservatorships was to reduce the stigma attached to elderly persons being labeled "mentally incompetent" who were in need of assistance in managing their personal and financial affairs. (See *Union Bank of California v. Superior Court* (2004) 115 Cal.App.4th 484, 488–489 [9 Cal.Rptr.3d 137]; Guardianship-Conservatorship Law with Official Comments (June 1980) 15 Cal. Law Revision Com. Rep. (1980) pp. 451, 463, 477–478.) Thus, we cite California case law which refers to adult guardians of incapacitated persons.

Under California ademption law, the guardian or conservator of a person who is not competent cannot cause an ademption of a specific gift when the incapacitated individual dies without regaining competency. (*Estate of Mason, supra,* 62 Cal.2d at p. 215.) In *Mason,* Mary Mason devised her home to Robert T. Fairbank, her grandson. (*Ibid.*) After making her will, Ms. Mason became mentally incapacitated and a guardian, Security Pacific Bank, was appointed. (*Ibid.*) The guardian, with court approval, sold the home and kept the proceeds of the sale in a separate account which was then used to support Ms. Mason who remained incompetent until her death. (*Ibid.*) The Supreme Court concluded, if the testator has disposed of the property and it cannot be traced to any other property in the estate, there is an ademption. (*Id.* at p. 215.) However, when the specific property has been

disposed of by a guardian during a period of incapacitation from which the testator does not recover, there is *no* ademption of the specific property when the only change is in form. (*Id.* at pp. 215–216.) If the guardian of a mentally incapacitated person sells property subject to a testamentary instrument, the beneficiary will receive the proceeds of the sale in the absence of proof that the testator intended an ademption. (*Id.* at p. 215.) The Supreme Court explained the rationale for this rule thusly: "The reasons for refusing to find an ademption upon the guardian's sale are: (1) The incompetent testator lacks intent to adeem [citation] and the opportunity to avoid the effect of an ademption by making a new will. [Citations.] (2) A contrary rule would allow the guardian, by changing the form of guardianship property, to determine the distribution of the estate. [Citations.]" (*Id.* at p. 216.)

This rule prohibiting ademption by the actions of a guardian of an incapacitated person is also illustrated in two post-*Estate of Mason* Court of Appeal opinions. The first opinion is *Estate of Packham, supra*, 232 Cal.App.2d at pages 848–849. In *Estate of Packham*, Elisabeth Packham devised an interest which she might own at the time of her death in a residence or a sum equal to the net proceeds of the sale of the home. (*Id.* at p. 848.) The precise interest to be devised was described as follows in Ms. Packham's will: " 'Any interest in the residential real property known as 57 Amador Avenue, Atherton, California, which I may own at the time of my death, or a sum equal to the net proceeds of sale of any said interest occurring during the administration of my estate.' " (*Ibid.*) A bank was appointed as Ms. Packham's guardian after she was found to be incapacitated. Ms. Packham did not regain competency prior to her death. (*Ibid.*) During the time Ms. Packham was incapacitated, the guardian sold the residence, which sale was confirmed by the court. (*Ibid.*) As a result, Ms. Packham's niece received neither the residence nor the proceeds from the sale. Relying on *Mason*, the Court of Appeal in *Packham* held the guardian's sale of the residence while Ms. Packham was incapacitated did not result in an ademption. (*Id.* at pp. 848–849.) Therefore, Ms. Packham's niece was entitled to the sale proceeds.

The second post-*Estate of Mason* decision to discuss ademption of property of an incapacitated person is *Estate of Ehrenfels* (1966) 241 Cal.App.2d 215, 218–228 [50 Cal.Rptr. 358]. In her will, Camille Ehrenfels bequeathed a specific gift of Standard Oil stock " 'as presently constituted' " to the beneficiaries with a provision that if the shares changed by splitting or otherwise, the legacies would be satisfied with the changed shares. (*Id.* at p. 218.) After Ms. Ehrenfels executed the will, the stock split. Two years later, Ms. Ehrenfels was found to be incapacitated and a guardian, Virginia Williams, was appointed. (*Id.* at pp. 218–219.) Ms. Williams, with court approval, subsequently exchanged the split Standard Oil stock for shares in a

mutual fund. (*Id.* at p. 219.) Ms. Ehrenfels, the testatrix, died without regaining competency. (*Ibid.*)

In *Estate of Ehrenfels*, the Court of Appeal described the Supreme Court's analysis in *Estate of Mason, supra,* 62 Cal.2d at page 216, thusly: "In *Mason,* however, it was held that in the absence of proof that the testator intended an ademption, the sale of property specifically bequeathed in the testator's will by the guardian of the estate of the testator during an incompetency from which the testator does not recover does not adeem the specific bequest. (See also *Estate of Packham,* [*supra,*] 232 Cal.App.2d [at pp.] 848–849 . . . .) In *Mason* the court was concerned with the manner of satisfying a specific bequest where the guardian had sold the specifically devised property and had consumed a substantial amount of the proceeds from this sale to support the incompetent testatrix until her death. Under such a factual situation the Supreme Court concluded that the devisee of the specifically devised property was entitled to have his devise satisfied in full from the residue of the decedent's estate." (*Estate of Ehrenfels, supra,* 241 Cal.App.2d at pp. 226–227.) The Court of Appeal concluded: "The holding in the *Mason* and *Packham* cases to the effect that when the guardian of a mentally incompetent testator has sold property which is the subject of a specific gift in his ward's will, the beneficiary is awarded the proceeds of the sale has been followed by cases in other jurisdictions. These cases were cited with approval in *Mason.* [Citations.]" (*Estate of Ehrenfels, supra,* 241 Cal.App.2d at p. 227.)

█ In terms of the remedy available to a beneficiary of a bequest of property by an incapacitated person which has been sold, the Court of Appeal in *Estate of Ehrenfels* explained: "In *Mason* the Supreme Court speaking of the ademption of a specific bequest noted that an ademption takes place 'when the specific property has been disposed of *by the testator and cannot be traced to other property in the estate.* . . .' (Italics partly added; p. 216.) In [6 Page, Wills (Bowe-Parker Rev. 1962) § 54.18, pp. 271, 272] the authors, citing some of the cases in the other jurisdictions relied upon in *Mason,* state that 'it is generally held in the United States that the sale, collection, and the like by the guardian does not adeem a specific devise or legacy; and that the devisee or legatee *takes the proceeds as far as they can be traced.*' (Italics added; p. 272.) [¶] It is apparent that *Mason* does not prohibit the guardian of a person who has become incompetent after making his will from selling, exchanging or reinvesting, pursuant to lawful authority, property which is the subject of a specific devise or legacy under the will. While the guardian's act in so doing does not adeem the specific devise or legacy it relegates the devisee or legatee to taking the proceeds of the sale as far as they can be traced." (*Estate of Ehrenfels, supra,* 241 Cal.App.2d at pp. 227–228.)

No California cases have directly addressed the ademption issue when stock is bequeathed and the corporation is subsequently dissolved, which occurs after the testator becomes incapacitated. Three out-of-state decisions that have addressed similar issues have held that no ademption occurs upon dissolution of a corporation. (*Mitchell v. Mitchell* (1945) 208 Ark. 478 [187 S.W.2d 163, 164–165] [no guardianship but bequest of stock not adeemed by the dissolution of the corporation and continuance of enterprise as personal business where the testator's interest remained substantially the same]; *Buder v. Stocke* (1938) 343 Mo. 506 [121 S.W.2d 852, 857–858] [a guardian's liquidation of corporation did not adeem bequest of stock owned solely by testator]; *Pope v. Hinckley* (1911) 209 Mass. 323 [95 N.E. 798, 799] [no ademption where dissolution of New Jersey corporation followed by formation of a Connecticut corporation and testator's rights in new entity dependent on rights in first company].) No decision reaches the conclusion asserted by Ms. Labow, Ms. Joseph, and Ross that an ademption occurs under circumstances similar to this case.

Here, Rubin executed a revocable trust giving a specific stock gift to Mr. Brown. On or around November 1997 and January 1998, after Rubin was adjudicated to require the assistance of a conservator, the directors, the officers, the shareholders, and the successor trustee, Ms. Labow, adopted resolutions approving the liquidation and dissolution of Brown Wholesale Electric; the sale of assets and real property; and a corporate name change. Mr. Brown and Ross each served as the directors, the officers, the shareholders during the process. Ms. Labow served as a director, an officer, and the successor trustee in making the decision to sell the corporation's assets. Ross testified that the buyer dictated the terms of the sale which consisted of an asset, as opposed to a stock, sale. Although no stock was sold, the funds from the asset sale were distributed to the shareholders according to their proportionate interests in the corporation. In her capacity as successor trustee, Ms. Labow advised the probate court, "The 95.54% interest of the stock in Brown Wholesale Electric Company owned by the within Trust and recovered for the benefit of the Trust and Trustor has been valued at [$23,221,895.02], which represents the value after the sale of the assets, the payment of corporate debts, and the receipt of liquidating dividends." There is no dispute that during the time of the asset sale, Rubin was under a conservatorship and remained incompetent until his death in 2004. Even though the stock was not sold by the time of Rubin's death, it was rendered valueless by an asset sale which Ms. Labow as the conservator failed to prevent. Nevertheless, the asset sale, in turn, resulted in a payment to the conservatorship estate of the proportionate shares of Rubin's stock. The conservatorship estate was paid over $23 million dollars, which represented the value of the stock owned by the trust. The trust then received the total amount representing the value of the stock. The amount is traceable. In short,

the circumstances of the transaction show that Rubin was never completely divested of an interest in the stock. Thus, the asset sale did not amount to a complete divesture of Rubin's interest in the stock. Under the circumstances, the asset sale resulted in a change in the form of the stock.

### C. There Is No Substantial Evidence Rubin Intended an Ademption to Occur

As noted, the Supreme Court has explicitly stated that an ademption can lawfully occur if the testator intended such. (*Estate of Mason, supra*, 62 Cal.2d at p. 215; *Estate of Ehrenfels, supra*, 241 Cal.App.2d at p. 227.) There is no substantial evidence Rubin intended that an ademption occur. Section 21102 provides, "the intention of the transferor as expressed in the instrument controls the legal effect of the dispositions made in the instrument." The interpretation of a trust instrument, like any written document, is a question of law. (*Estate of Gump* (1940) 16 Cal.2d 535, 548 [107 P.2d 17] [trust]; *Gardenhire v. Superior Court* (2005) 127 Cal.App.4th 882, 888 [26 Cal.Rptr.3d 143] [trust]; *Scharlin v. Superior Court* (1992) 9 Cal.App.4th 162, 168 [11 Cal.Rptr.2d 448] [trust]; *Wells Fargo Bank v. Marshall* (1993) 20 Cal.App.4th 447, 452–453 [24 Cal.Rptr.2d 507] [trust]; *Estate of Guidotti* (2001) 90 Cal.App.4th 1403, 1406 [109 Cal.Rptr.2d 674] [will], citing *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].) Under applicable rules of interpretation of written instruments, where there is no conflicting evidence, the reviewing court must independently interpret the document. (*Estate of Goyette* (2004) 123 Cal.App.4th 67, 71 [19 Cal.Rptr.3d 760]; *Estate of Dye* (2001) 92 Cal.App.4th 966, 976 [112 Cal.Rptr.2d 362]; *Ike v. Doolittle* (1998) 61 Cal.App.4th 51, 73 [70 Cal.Rptr.2d 887].) Thus, we exercise our independent judgment where conflicting inferences may be drawn from unconverted evidence. (*Estate of Guidotti, supra*, 90 Cal.App.4th at p. 1406; *Ike v. Doolittle, supra*, 61 Cal.App.4th at p. 73.) The paramount rule in construing such an instrument is to determine intent from the instrument itself and in accordance with applicable law. (*Estate of Goyette, supra*, 123 Cal.App.4th at p. 71; *In re Estate of DeLoreto* (2004) 118 Cal.App.4th 1048, 1052 [13 Cal.Rptr.3d 513]; *Estate of Dye, supra*, 92 Cal.App.4th at pp. 976–977; *Estate of Verdisson* (1992) 4 Cal.App.4th 1127, 1135 [6 Cal.Rptr.2d 363].)

In the case at bench, Ms. Labow, Ms. Joseph, and Ross argue Rubin's intent to adeem the property can be established from the absence of another term in the trust providing for the circumstances that occurred here; i.e., an asset as opposed to a stock sale. According to Ms. Labow, Ms. Joseph, and

Ross, an inference must be made that Rubin lacked the intent to prevent the ademption because, by the time of the tenth amendment to the trust Rubin had decreased the specific gift to Mr. Brown to 10 percent of the stock; Rubin had increased the gift of stock to Ross to 90 percent; Rubin had continued to make Ross the residual beneficiary of the trust; and Rubin had increased the gifts to his longtime companion, Ms. Joseph. Even if Rubin reduced the stock gift to 10 percent by executing the tenth amendment to the trust, the relevant point is that, while competent, Rubin made a specific stock gift to Mr. Brown. Thus, the only intent that may be inferred from the language in the trust is that Rubin made specified gifts to his sons upon death.

Furthermore, we are not persuaded that Rubin's intent to adeem the specific gift may be found based on testimony from Ms. Labow and Ross that Rubin wanted to sell Brown Wholesale Electric. Ross and Ms. Labow both testified that Rubin intended to sell Brown Wholesale Electric. Whatever intent may have existed regarding a future sale of Brown Wholesale Electric, there is *no* evidence that Rubin knew that the transaction would not include a stock sale that would render the gift to Mr. Brown worthless. Furthermore, no witness testified that Rubin ever intended the specific stock gift to Mr. Brown to fail in the event the stock was exchanged or not made part of the business sale. Rubin made no disposition of the stock while he was competent. Accordingly, there is no substantial evidence Rubin intended to adeem the stock gift by expressing an intent to sell the business prior to the competency proceedings.

Further, there is no merit to the contention that an ademption occurred because Ms. Labow was acting as a trustee when the sale occurred. The basis of this contention is the theory that section 21134 applies only to the conduct of a conservator but not a trustee. Section 21134, subdivision (a) states, "(a) Except as otherwise provided in this section, if after the execution of the instrument of gift specifically given property is sold or mortgaged by a *conservator* or by an agent acting within the authority of a durable power of attorney for an incapacitated principal, the transferee of the specific gift has the right to a general pecuniary gift equal to the net sale price of, or the amount of the unpaid loan on, the property." (Italics added.) Ms. Labow, Ms. Joseph, and Ross argue that section 21134, subdivision (a) does not apply to trustees. As such, they argue that the Legislature intended that a trustee could sell an asset thereby creating a lawful ademption.

█ Section 21134, subdivision (a) is not an exhaustive limitation on circumstances where an ademption can occur. Sections 21131 through 21135

were adopted to avoid the harsh effect of an ademption. (*Estate of Worthy* (1988) 205 Cal.App.3d 760, 765 [252 Cal.Rptr. 462]; see Ross, Cal. Practice Guide: Probate (The Rutter Group 2006) ¶ 16:555, p. 16-172.4 (rev. #1, 2006).) Section 21139 states, "The rules stated in Sections 21133 to 21135, inclusive, are not exhaustive, and nothing in those sections is intended to increase the incidence of ademption under the law of this state." The Law Revision Commission comment to section 21139 states, "This section recognizes that the rules stated in Sections 21133–21135 cover a number of special situations where a specific gift is not adeemed but do not cover all situations where a specific gift is not adeemed. This section also makes clear that the inclusion of these specific statutory rules is not intended to increase the incidence of ademption in California." (Cal. Law Revision Com. com., 54A West's Ann. Prob. Code (2007 ed.) foll. § 21139, p. 195.) There is no evidence the Legislature intended to abrogate the holdings concerning ademption of the gifts of an incapacitated person in *Estate of Mason, Estate of Ehrenfels,* or *Estate of Packham.*

■ This analysis is likewise dispositive of the argument that the adoption of portions of the Uniform Probate Code abrogated the holdings of *Estate of Mason, Estate of Ehrenfels,* or *Estate of Packham.* California decisional law has established rules against ademption under the circumstances of this case and nothing in any enactments adopting provisions of the Uniform Probate Code have altered those decisions. (See *Estate of Worthy, supra,* 205 Cal.App.3d at p. 766 [where California decisional law does not resolve an issue, the adoption of portions of the Uniform Probate Code may be useful].) Repeals by implication of long-established judicial rules are disfavored. (*People v. Davenport* (1985) 41 Cal.3d 247, 266 [221 Cal.Rptr. 794, 710 P.2d 861] ["[I]t should not be presumed that the legislative body intends to overthrow long-established principles of law unless such intention is made clearly to appear either by express declaration or by necessary implication."]; *Fuentes v. Workers' Comp. Appeals Bd.* (1976) 16 Cal.3d 1, 7 [128 Cal.Rptr. 673, 547 P.2d 449] ["Repeals by implication are not favored . . . ."].)

■ That Ms. Labow may have been acting as a successor trustee in connection with the stock sale does not resolve the issue of whether an ademption occurred; a conservator could not cause an ademption under these circumstances. The undisputed evidence shows that Ms. Labow, acting as the conservator, did nothing to preserve Rubin's testamentary intent regarding the stock gift. Her conduct extinguished the specific gift intent at a time when Rubin was incapacitated. The purpose of a conservatorship is to provide a legally competent person to act, under the court's guidance, as the conservatee's agent in the management of estate property. (*Board of Regents v. Davis*

(1975) 14 Cal.3d 33, 43 [120 Cal.Rptr. 407, 533 P.2d 1047]; *Conservatorship of Stewart* (1969) 276 Cal.App.2d 211, 214 [80 Cal.Rptr. 738].) A conservator has control of the estate, which is held in trust for the benefit of the conservatee. (§ 2401, subd. (a); *Middlecoff v. Middlecoff* (1959) 167 Cal.App.2d 698, 706 [335 P.2d 234]; *Doran v. Hibernia Savings & Loan Soc.* (1947) 80 Cal.App.2d 790, 792 [182 P.2d 630], disapproved on a different point in *Estate of Propst* (1990) 50 Cal.3d 448, 461–462 [268 Cal.Rptr. 114, 788 P.2d 628].) A conservator, under the court's scrutiny, has the power to make decisions on behalf of the conservatee. This includes exercising legal rights a conservatee had as a trustor. (§ 2401; *Johnson v. Kotyck* (1999) 76 Cal.App.4th 83, 87 [90 Cal.Rptr.2d 99].)

■ Under the doctrine of substituted judgment, the probate court is empowered to make orders authorizing or requiring the conservator to take a variety of actions with respect to a conservatee's estate plan. (§§ 2580, 2583; *Conservatorship of McDowell* (2004) 125 Cal.App.4th 659, 665 [23 Cal.Rptr.3d 10], disapproved on a different point in *Bernard v. Foley* (2006) 39 Cal.4th 794, 816, fn. 14 [47 Cal.Rptr.3d 248, 139 P.3d 1196]; *Johnson v. Kotyck, supra,* 76 Cal.App.4th at p. 87; *Conservatorship of Hart* (1991) 228 Cal.App.3d 1244, 1250 [279 Cal.Rptr. 249].) The actions that may be taken include actions to benefit the conservatee or the estate; minimize current or prospective tax consequences of the conservatorship estate or the estate upon the death of the conservatee; or provide a gift to charities, relatives, friends or other objects of bounty that would likely be beneficiaries of gifts from the conservatee. (§ 2580, subd. (a)(1)–(3).) The probate court may be authorized to grant the conservator the right to exercise the conservatee's right to revoke or modify a revocable trust. (§ 2580, subd. (b)(11).) But section 2580, subdivision (b)(11) limits the probate court's authority to authorize a modification of a revocable trust under these circumstances: "[B]ut the court shall not authorize or require the conservator to exercise the right to revoke or modify a revocable trust if the instrument governing the trust (A) evidences an intent to reserve the right of revocation or modification exclusively to the conservatee, (B) provides expressly that a conservator may not revoke or modify the trust, or (C) otherwise evidences an intent that would be inconsistent with authorizing or requiring the conservator to exercise the right to revoke or modify the trust."

■ In this case, the revocable living trust was part of the conservatorship estate. Section 3.03 of the trust states: "RIGHT TO AMEND OR REVOKE TRUST [¶] While Trustor is competent, Trustor, acting alone, may from time to time, by written notice signed by Trustor and delivered to the Trustee, amend any provision hereof or revoke this Trust." Section 3.06 of the trust

provides: "<u>EXERCISE OF POWERS RESERVED TO TRUSTOR IF TRUS-TOR INCOMPETENT</u> [¶] A power reserved to Trustor under this Article may not be exercised by Trustor if Trustor is incompetent (as defined in this Trust) at the pertinent time, but may be exercised by the duly appointed conservator or guardian of Trustor's estate, pursuant to specific court authorization . . . ." Consistent with section 2580, subdivision (b)(11), the trust provides that a conservator may, with probate court approval, revoke the terms of the trust. No prior probate court approval was obtained to revoke the specific stock gift to Mr. Brown. A valuable asset of the conservatorship estate was dissipated without court authorization or approval. Ms. Labow had no authority or power to unilaterally dispose of property which belonged to the conservatorship estate.

### D.   The Statutory Compromise Offer

Mr. Brown contends the probate court erred in ruling that Ross could orally revoke the Code of Civil Procedure section 998 statutory compromise offer. Code of Civil Procedure section 998, subdivision (b) provides: "Not less than 10 days prior to commencement of trial . . . any party may serve an offer in writing upon any other party to the action to allow judgment to be taken or an award to be entered in accordance with the terms and conditions stated at that time. The written offer shall include a statement of the offer, containing the terms and conditions of the judgment or award, and a provision that allows the accepting party to indicate acceptance of the offer by signing a statement that the offer is accepted. Any acceptance of the offer, whether made on the document containing the offer or on a separate document of acceptance, shall be in writing and shall be signed by counsel for the accepting party or, if not represented by counsel, by the accepting party."

■   We disagree with Mr. Brown that the probate court's order refusing to enforce the statutory settlement offer must be reversed because the revocation was communicated orally. Once a Code of Civil Procedure section 998 statutory settlement offer is made, it is subject to revocation. (*Poster v. Southern Cal. Rapid Transit Dist.* (1990) 52 Cal.3d 266, 272 & fn. 2 [276 Cal.Rptr. 321, 801 P.2d 1072]; *Berg v. Darden* (2004) 120 Cal.App.4th 721, 731 & fn. 3 [15 Cal.Rptr.3d 829].) Our Supreme Court has held: "It is a well-established principle of contract law that an offer may be revoked by the offeror any time prior to acceptance. [Citations.] In light of this firmly established principle of contract law, it is clear that if the Legislature intended to make section 998 offers irrevocable, it would have expressly and un-

equivocally said so. It did not. In the absence of such language, the general rule that offers may be revoked prior to acceptance should apply." (*T. M. Cobb Co. v. Superior Court* (1984) 36 Cal.3d 273, 278 [204 Cal.Rptr. 143, 682 P.2d 338], fn. omitted; see *Poster v. Southern Cal. Rapid Transit Dist., supra*, 52 Cal.3d at p. 272.) ▇ Code of Civil Procedure section 998, subdivision (b) requires that an offer and acceptance be in writing. But there is no similar provision requiring that a revocation be in writing. When the statutory settlement provisions do not address an issue, general contract principles may control the outcome of a dispute concerning the enforceability of an acceptance so long as they do not conflict with Code of Civil Procedure section 998 nor defeat its purpose. (*T. M. Cobb Co. v. Superior Court, supra*, 36 Cal.3d at p. 280; *Marcey v. Romero* (2007) 148 Cal.App.4th 1211, 1215–1216 [56 Cal.Rptr.3d 402].) Our Supreme Court has held that the general contract principle that settlement offers are revocable until accepted serves rather than defeats the purpose of section 998. (*T. M. Cobb Co. v. Superior Court, supra*, 36 Cal.3d at p. 281; see *Marcey v. Romero, supra*, 148 Cal.App.4th at p. 1216.) It is well established that a written offer may be orally revoked. (*Ersa Grae Corp. v. Fluor Corp.* (1991) 1 Cal.App.4th 613, 621 [2 Cal.Rptr.2d 288]; *Bellasi v. Shackelford* (1962) 201 Cal.App.2d 265, 267–268 [19 Cal.Rptr. 925]; Civ. Code, §§ 1582, 1583, 1587, subd. (1); 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 164, p. 201.)

In this case, on March 30, 2006, Mr. Holcomb (Ross's attorney) discussed the offer in a telephone conversation. Mr. Holcomb stated to Ms. Smith (Mr. Brown's attorney) that the offer was void and that Ross no longer agreed to the terms. Mr. Holcomb and Ms. Smith then apparently discussed new terms that would be raised under an alternative agreement. Ms. Smith stated she would discuss the alternative resolution with her client. Mr. Holcomb did not confirm the communication in which the offer was revoked in writing. Thereafter, Mr. Brown through his attorney filed a written acceptance of the offer on April 6, 2006. There is no dispute that Ross, through Mr. Holcomb, stated the offer had been revoked on March 30, 2006, prior to its acceptance on April 6, 2006. No authority has been cited that requires a written revocation of a Code of Civil Procedure section 998 statutory compromise offer. Under general contract principles, revocation may be oral. Accordingly, we conclude the probate court properly quashed the acceptance of the offer under applicable contract principles. (Civ. Code, §§ 1581, 1582, 1583, 1587, subd. (1); *Bellasi v. Shackelford, supra*, 201 Cal.App.2d at pp. 267–268.)

## IV.   DISPOSITION

The order denying the petition to determine no ademption occurred is reversed. The order granting the motion to quash acceptance of the Code of Civil Procedure section 998 statutory compromise offer is affirmed. Each side to bear their own costs on appeal.

Mosk, J., and Kriegler, J., concurred.