Filed 3/26/13  In re Hartenstein Family Trust CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re the POLA HARTENSTEIN FAMILY TRUST | B240493 |
| | (Los Angeles County Super. Ct. No. BP125686) |
| CHARLENE HARTENSTEIN et al., | |
| Plaintiffs and Appellants, | |
| v. | |
| FELICE HARTENSTEIN, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Mitchell L. Beckloff, Judge.  Reversed and remanded with directions.

Mansell & Mansell and Cheryl B. Mansell; Law Offices of Philip R. Homsey II and Philip R. Homsey II for Plaintiffs and Appellants.

Law Offices of Tracey P. Hom and Tracey P. Hom for Defendant and Respondent.

In the underlying action regarding the enforcement of a trust instrument, the trial court found that the instrument allocated the interests in a house in equal shares to two trusts. Appellants contend that the instrument requires the house to be allocated entirely to one of the trusts. We conclude that they are correct, and therefore reverse.

RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

A. *1998 Trust Instrument*

Uri and Pola Hartenstein were married for more than 50 years. They had three children, respondent Felice Hartenstein, and appellants Charlene Hartenstein and Annette Hartenstein-Schultz.[1]

In December 1998, Uri and Pola executed a trust instrument prepared by attorney Phillip Tangalakis. The instrument established a simple trust for their assets, and designated them as co-trustees while they both remained alive. Upon Uri's or Pola's death, the instrument provided for the allocation of the trust's assets into two subtrusts, an exemption trust and a survivor's trust, with the goal of "eliminat[ing] or . . . reduc[ing]" federal estate taxes without "impair[ing]" the federal marital deduction. The survivor, as sole trustee, was authorized to amend, revoke, or terminate only the survivor's trust; the exemption trust became irrevocable. Upon the survivor's death, appellants and respondent were to receive equal shares of the assets in the exemption trust, as well as equal shares of the assets in survivor's trust, unless it had been amended or revoked.

Uri died in November 2000, rendering Pola the surviving spouse and sole trustee. When Uri died, the trust's only asset was Uri and Pola's house.

---

[1] Because the parties and their parents share their surname, we refer to them by their first names.

2

B.  *Attempted Revocation of Exemption Trust*

In March 2004, Pola executed a trust modification, providing that the exemption trust would not be funded, and that only the survivor's trust would remain in existence.  Later, in April 2004, she executed other documents purporting to revoke the exemption and survivor's trusts, create a new trust, and disinherit appellants; in addition, she executed a grant deed transferring the house to the new trust.  Under the documents, Pola and Felice were to be co-trustees of Pola's 2004 trust, and Felice was to be its sole beneficiary upon Pola's death.  Attorney Tangalakis prepared the trust modification and the other documents establishing the 2004 trust.

C.  *Underlying Action*

Pola died in July 2010.  On November 22, 2010, appellants filed a petition challenging the 2004 trust and the purported revocation of the 1998 exemption trust.  They contended that under the 1998 trust instrument, the exemption trust became irrevocable upon Uri's death, and that Pola was required to fund it to the full extent of $675,000 federal estate tax credit effective when Uri died.[2]  In opposing the petition, respondent maintained that the instrument did not require Pola to allocate any assets to the exemption trust, and that its funding was left to her discretion.

A bench trial on the petition occurred in January 2012.  During the trial, the parties stipulated that at the time of Uri's death, the house was worth less than $675,000.  Although the parties also stipulated that the terms of the 1998 trust instrument were "clear and unambiguous," Tangalakis testified regarding Uri's and

---

[2]     Appellants' petition alleged that when Uri died, the value of the house was $900,000.

Pola's intent in executing the instrument, and appellants submitted expert testimony bearing on its meaning. Appellants argued that under the 1998 trust instrument, the house was an asset of the exemption trust because its value when Uri died was less than the estate tax credit at that time. In contrast, respondent asserted that the house had been consigned to the survivor's trust, which was subject to amendment and revocation by Pola.

Following the presentation of evidence, the trial court issued a ruling expressly predicated on the parties' stipulation that the 1998 trust instrument was clear and unambiguous. The court concluded that the instrument required equal interests in the house to be allocated to the exemption trust and the survivor's trust; in addition, the court determined that the provisions of Pola's 2004 trust purporting to revoke the exemption trust were void. The court further found that respondent, as trustee of the 2004 trust, was the constructive trustee of a 50 percent interest in the house and 50 percent of the income from the house arising after Pola's death. The court ordered respondent to execute a grant deed conveying a 50 interest in the house to the trustees of the exemption trust, and to deliver to them 50 percent of the house's income arising after Pola's death. The court also confirmed appellants and respondent as the successor co-trustees of the exemption trust.

## DISCUSSION

Appellants contend the trial court erred in determining that the 1998 trust instrument requires the allocation of equal interests in the house to the exemption and survivor's trusts. They argue that the instrument mandates that the house be allocated entirely to the exemption trust. As explained below, we agree.

4

A. *Governing Principles*

Appellant's contention requires us to interpret the 1998 trust instrument. Generally, "''"[i]n construing trust instruments, as in the construction and interpretation of all documents, the duty of the court is to first ascertain and then, if possible, give effect to the intent of the maker." [Citations.]' [Citation.] '[Probate Code s]ection 21102 provides, "[T]he intention of the transferor as expressed in the instrument controls the legal effect of the dispositions made in the instrument."' [Citations.] '"In construing a trust instrument, the intent of the trustor prevails and it must be ascertained from the whole of the trust instrument, not just separate parts of it." [Citations.]' [Citation.]" (*Estate of Cairns* (2010) 188 Cal.App.4th 937, 944.)

Ordinarily, "[t]he interpretation of a will or trust instrument presents a question of law unless interpretation turns on the credibility of extrinsic evidence or a conflict therein." (*Burch v. George* (1994) 7 Cal.4th 246, 254.) Here, the trial court heard testimony regarding the instrument, but its analysis of the instrument begins by referring to the stipulation, contains no discussion of the trial testimony, and focuses exclusively on the language of the instrument. Because the court found no ambiguity in the instrument, we also construe the instrument in light of its language. (*McAllister v. Metzger* (1963) 220 Cal.App.2d 692, 702-703.) Our review is thus de novo. (*Ibid.*)

Under the circumstances, our task is to determine the trustors' intent at the time the instrument was executed (*Brown v. Labow* (2007) 157 Cal.App.4th 795, 812), as shown by the face of the document (*Mummert v. Security-First Nat. Bank* (1960) 183 Cal.App.2d 195, 199 (*Mummert*)). Generally, we will give the words of the instrument "their ordinary and grammatical meaning." (Prob. Code, § 21122.) However, as the parties stipulated that an attorney prepared the

instrument, we may infer that legal terms in it are used in their technical sense. (*Estate of McKenzie* (1966) 246 Cal.App.2d 740, 744.)

Our inquiry requires us to construe provisions involving the federal estate tax credit and marital deduction. Generally, federal law establishes a credit that is applied against the value of a decedent's gross estate, for purposes of determining federal estate tax. (26 U.S.C. §§ 2001, 2010(a); see *Ike v. Doolittle* (1998) 61 Cal.App.4th 51, 60 (*Ike*).) At trial, the parties stipulated that the value of this credit when Uri died was $675,000.

For purposes of determining federal estate tax, federal law also establishes a marital deduction "consisting of a deduction from a decedent's gross estate of the value of property interests passing from the decedent to his surviving spouse." (*Estate of Libeu* (1988) 205 Cal.App.3d 1436, 1445; 26 U.S.C. § 2056.) Under the marital deduction, certain property belonging to the decedent "is excluded from the decedent's gross estate for purposes of federal estate taxes; however, the property so excluded must then be included in the surviving spouse's estate for federal tax purposes when he or she dies. (26 U.S.C. § 2056(a), (b)(7)(A)(i).)" (*McIndoe v. Olivos* (2005) 132 Cal.App.4th 483, 489 (*McIndoe*).) At trial, the parties stipulated that the value of this deduction when Uri died was unlimited.

B. *1998 Trust Instrument*

We turn to the main provisions of the 1998 trust instrument. Article I, which establishes the original trust, identifies the property that Uri and Pola agreed to assign to the trust. Paragraph G of that article further states: "[The] Trustors declare that all property that may be included in this Trust Estate as their community property and all property transferred into this Trust shall retain its character as such regardless of the transfer[,] and in the event that this Trust[] in any way fails, and said community property is returned to the Trustors, it shall be

6

returned as their community property and not as the separate property of either or both Trustors."

The provisions governing the subtrusts are found in Articles II, III, and IV. Paragraph B of Article II provides that upon the death of the first trustor, the original trust was to be split into two distinct trusts, the survivor's trust and the exemption trust. Paragraph C of Article III further states: "Upon the Deceased Spouse's death the Surviving Spouse may amend, revoke[,] or terminate the Survivor's Trust; but the Exemption Trust may not be amended, revoke[d] or terminated." Paragraph A of Article IV further specified that after the surviving spouse died, appellants and respondent were to receive equal shares of the assets in the exemption trust, as well as equal shares of the assets in the survivor's trust, unless it had been revoked or terminated.

Article II contains the key provisions governing the allocation of assets to the two trusts. Pertinent here are the first and third subparagraphs of Paragraph C, each of which concerns the survivor's trust. The first subparagraph states: "The Survivor's Trust shall consist of Trust assets equal in value to the minimum pecuniary amount necessary to entirely eliminate, or to reduce to the maximum extent possible, any federal estate tax at Trustor's death. In making this determination, the Trustee shall take into consideration all Federal Estate Tax deductions and all Federal Estate Tax credits other than those for State Death Taxes." The third subparagraph states: "The Trustee shall not allocate to [the] Survivor's Trust assets having an aggregate fair market value at the date of allocation that is less than the marital deduction amount as finally determined for Federal Estate Tax purposes."[3]

---

[3] The second subparagraph of paragraph C, which also concerns the survivor's trust, provides: "This allocation to [the] Survivor's Trust shall be satisfied in cash or in kind, *(Fn. continued on next page.)*

7

Paragraph D, which concerns the exemption trust, provides in pertinent part: "The Exemption Trust shall consist of the balance of the Trust Estate plus any amount disclaimed on behalf of the surviving spouse . . . ."

Article II also describes the purpose underlying the creation of the survivor's trust. Paragraph J states: "It is the Trustor[s'] intention to have the Survivor's Trust qualify for the marital deduction under the Internal Revenue Code Section 2056 [(26 U.S.C. § 2056)] and regulations pertaining thereto . . . . In no event shall the Trustee take action or have any power that will impair the marital deduction, and all provisions regarding the Survivor's Trust shall be interpreted to this primary objective."

The issues in the underlying action concerned Uri's and Pola's intent in adopting this type of trust structure. Viewed as a totality, the trust instrument reveals Uri's and Pola's intent to pair an irrevocable subtrust that potentially took advantage of the estate tax credit (the exemption trust) with a subtrust that made similar use of the marital deduction (the survivor's trust). Typically, this type of trust structure is employed by married trustors to control the disposition of their property after their death while making some provision for the living spouse through the marital deduction. (See *McIndoe*, *supra*, 132 Cal.App.4th at pp. 488-489; *Ike*, *supra*, 61 Cal.App.4th at pp. 61-62.) The structure permits a trustor to ensure that after his or her death, designated children will inherit the assets placed in the irrevocable trust designed to draw on the estate tax credit. (*McIndoe*, *supra*, at pp. 488-489; *Ike*, *supra*, at p. 61.) However, as explained below, during the underlying proceedings, respondent denied that Uri and Pola intended the 1998

or partly in each, only with assets eligible for the marital deduction. Assets allocated in kind shall be deemed to satisfy this amount on the basis of their values as finally determined for Federal Estate Tax purposes."

8

trust instrument to assure their children's equal inheritance through the exemption trust.

C. *Underlying Proceedings*

At trial, appellants contended that Pola was required to allocate the house in its entirety to the exemption trust. They identified the controlling provision as the first subparagraph of paragraph C in Article II, which states in pertinent part: "[The] Survivor's Trust *shall* consist of Trust assets *equal* in value to *the minimum pecuniary amount necessary to entirely eliminate, or to reduce to the maximum extent possible, any federal estate tax at the Trustor's death.*" (Italics added.) As appellants noted, because the value of the house at Uri's death was less than the $675,000 federal estate tax credit, no federal estate tax was owed when he died. Pointing to the italicized portion of paragraph C, they argued that the survivor's trust was to receive no assets, as it was unnecessary to allocate *any* assets to it in order to eliminate the federal estate tax because "the minimum pecuniary amount necessary" to eliminate the tax was $0.

In contrast, respondent contended that all the assets in the original trust were to be allocated to the survivor's trust upon Uri's death, with the exception of any assets Pola elected to place in the exemption trust. Respondent relied on the third subparagraph of paragraph C in Article II, which states: "The Trustee shall *not* allocate to [the] Survivor's Trust *assets having an aggregate fair market value at the date of allocation that is less than the marital deduction amount* as finally determined for Federal Estate Tax purposes." (Italics added.) In addition, she pointed to paragraph D in that article, which provides that the exemption trust shall receive the balance of the estate "plus any amount *disclaimed* on behalf of the surviving spouse." (Italics added.) Respondent argued that because the marital deduction was unlimited when Uri died, the italicized portion of paragraph C

9

required all the trust assets to be allocated initially to the survivor's trust; in addition, she argued that under paragraph D, the exemption trust was to receive only those assets that Pola affirmatively disclaimed.

The trial court rejected respondent's interpretation of the trust instrument, insofar as respondent maintained that the house was to be allocated in its entirety to the survivor's trust. The court also agreed with appellants' interpretation in part, stating: "As there was no estate tax due at Uri's death, . . . the minimum pecuniary amount necessary to eliminate the tax considering the Federal Estate tax credit was zero. Thus, pursuant to the first [subparagraph of paragraph C], no assets were required to be allocated to the Survivor's Trust . . . ."

Nonetheless, the trial court concluded that appellants' interpretation improperly disregarded the third subparagraph of paragraph C. In ruling that equal interests in the house were to be allocated to the subtrusts, the court stated that the portion of the third subparagraph italicized above "sets a minimum value" on the assets to be allocated to the survivor's trust. The court further reasoned: "[E]ven though the minimum pecuniary amount necessary to avoid [the] federal estate tax was zero, . . . the trustee must allocate assets valued at the marital deduction to the Survivor's Trust. [¶] Here, . . . the marital deduction was unlimited. The only property held by Uri at the time of his death was his one-half community property interest in the . . . home. As only a deceased spouse's property qualifies for the marital deduction, the marital deduction amount would be Uri's one-half interest in the . . . home. [¶] Accordingly, . . . the Survivor's Trust was required to be funded with a value equal to one-half of the community property or a 50 percent interest in the . . . home."

10

D. *Analysis*

For the reasons explained below, we agree with appellants that the 1998 trust instrument required the house to be allocated entirely to the exemption trust. In interpreting the instrument, we seek a construction that respects the language used (*Huscher v. Wells Fargo Bank* (2004) 121 Cal.App.4th 956, 972), and avoids rendering key phrases as surplusage (*Comstock v. Corwin* (1952) 111 Cal.App.2d 770, 772-773).

Although the trust instrument provided that Uri's and Pola's community property retained that character in the trust, Pola was obliged to transfer her community property interest in the house from the original trust to the exemption trust if required to do so under the instrument. (*Aguilar v. Aguilar* (2008) 168 Cal.App.4th 35, 38-39; Prob. Code, § 104.) We therefore focus our inquiry on the instrument's terms regarding the allocation of assets. Here, the controlling provisions are paragraphs C and D of Article II, as each attends to a particular subtrust and begins by stating that the subtrust "shall consist" of specified assets from the original trust.

Of the two provisions, paragraph C must be viewed as preeminent because paragraph D, which addresses the exemption trust, refers to "the balance" of assets not allotted to the survivor's trust under paragraph C. The initial sentence of paragraph C, by its plain language, identifies the exact amount of assets to be placed in the survivor's trust: it states that the survivor's trust shall consist of assets "*equal* in value to the minimum pecuniary amount necessary" to eliminate the federal estate tax. (Italics added.) As no federal estate tax was due upon Uri's death, the "minimum pecuniary amount necessary" to be allocated to the survivor's trust in order to eliminate such estate tax was zero. Accordingly, the effect of the

11

initial sentence was to dictate that the survivor's trust receive no assets from the original trust.[4]

Viewed in context, the third subparagraph of paragraph C does not modify the allocation specified in the first sentence of paragraph C. The third paragraph states: "The Trustee shall not allocate to [the] Survivor's Trust assets having *an aggregate fair market value at the date of allocation* that is less than *the marital deduction amount as finally determined for Federal Estate Tax purposes*." As the italicized terms indicate, the third subparagraph prohibits the trustee from allocating to the survivor's trust any assets whose total value on the date of the allocation is less than the amount of the marital deduction "as finally determined," for purposes of the federal estate tax.

In light of the phrase "as finally determined," the latter amount must be regarded as Uri's *actual* marital deduction. Neither the unlimited marital deduction specified in federal law (as proposed by respondent) nor the one-half community property interest in the house that Uri theoretically could have claimed (as proposed by the trial court) satisfy the terms of the third subparagraph, as those sums are not the product of a "final[]" determination. Here, Uri's federal estate tax credit shielded his one-half community property interest in the house from federal estate tax, leaving no assets subject to the marital deduction. Because Uri's actual

---

[4] We note that this conclusion comports with paragraph D, which provides in full: "The Exemption Trust shall consist of the balance of the Trust Estate plus any amount disclaimed on behalf of the surviving spouse, *in the amount equal to the maximum sum that can be allocated to a Trust* that does not qualify for the Federal Estate Marital deduction to any extent *without producing any Federal Estate Tax, after taking into account, all Federal Estate Tax deductions and all Federal Estate Tax credits, to which the Trust may be entitled to*." (Italics added.) In view of the italicized terms, paragraph D appears to require that the exemption trust be funded with assets up to a defined maximum, namely, the point at which the total value of its assets equaled the federal estate tax credit.

marital deduction was $0, the third subparagraph imposes no requirement on the trustee regarding the allocation of assets to the survivor's trust. Accordingly, it did not oblige the trustee to allot any assets to that trust.

We find additional support for our conclusion regarding the third subparagraph from Internal Revenue Service (IRS) Revenue Procedure 64-19, 1964-1 C.B. 682 (Revenue Procedure 64-19).[5] This procedure states requirements for the availability of the marital deduction when "the governing instrument" requires a trustee to select assets to be distributed. (*Id*. at §§ .01 - .02.) As explained below, the third paragraph is reasonably viewed as intended to ensure that the survivor's trust satisfied the procedure's requirements regarding the marital deduction.

Under Revenue Procedure 64-19, the marital deduction will be allowed when the trust instrument obliges the trustee to transfer a decedent's assets "having an aggregate fair market value at the date . . . . of distribution amounting to no less than the amount of the pecuniary [amount of] . . .[the] transfer, as finally determined for Federal estate tax purposes." (*Id*. at §§ .01 - .02.) The procedure thus makes the marital deduction available when the trustee must allocate assets whose value when allocated is not less than their value for purposes of the marital

---

[5] Although appellants argued before the trial court that Revenue Procedure 64-19 supported their interpretation of the trust instrument, they never asked the trial court to take judicial notice of it, and no copy of it is found in the record. Instead, appellants attached a copy of Revenue Procedure 64-19 as an exhibit to their opening brief, but did not request that we take judicial notice of it. We proposed to take judicial notice of it on our motion, and invited respondent to submit an opposition. Respondent's letter contained no argument that judicial notice is inappropriate, but instead challenged appellants' interpretation of the trust instrument. As our review is de novo and respondent has had a full opportunity to discuss the relevance of Revenue Procedure 64-19, we conclude that we may properly take judicial notice of it, and do so. (*Shamsian v. Atlantic Richfield Co.* (2003) 107 Cal.App.4th 967, 975, fn. 5; *Freis v. Soboroff* (2000) 81 Cal.App.4th 1102, 1104; Evid. Code, §§ 452, subd. (b), 459, subd. (d).)

13

deduction, as finally determined for Federal estate tax purposes. Because the third subparagraph in paragraph C reflects this requirement, the subparagraph is nothing more than an attempt to ensure that the survivor's trust qualifies for the marital deduction. Accordingly, the third paragraph merely implements the trustors' intention stated in paragraph J of Article II, namely, "to have the Survivor's Trust qualify for the marital deduction."

Respondent contends that we must accept the trial court's interpretation of the instrument because that interpretation was supported by the evidence presented at trial. However, as explained above (see pt. B., *ante*), after hearing the evidence at trial, the court referred solely to the parties' stipulation that the instrument contained no ambiguity. This was entirely proper. Generally, the decision whether to admit extrinsic evidence to interpret a trust instrument involves a two-step process: the court provisionally receives the evidence to determine whether the instrument is "'reasonably susceptible'" to the interpretation urged by a party; if it is, the evidence is admitted for purposes of construing the instrument. (*Estate of Kaila* (2001) 94 Cal.App.4th 1122, 1130-1133.)

Our focus is on the trial court's conclusion at the first step, which presents a question of law, and is reviewed de novo. (*Estate of Kaila, supra,* 94 Cal.App.4th at pp. 1130-1133.) At trial, the court heard testimony bearing on the instrument's meaning only from attorney Tangalakis and appellant's expert, attorney Margaret Lodise.[6] Tangalakis testified in support of respondent's interpretation, namely, that the third subparagraph of paragraph C required the survivor's trust to receive all of the original trust's assets upon Uris' death. According to Tangalakis, he

_____

[6] Although Charlene testified that she was present when Uri and Pola met with Tangalakis to discuss the trust instrument, she provided no testimony regarding the provisions of the instrument at issue here.

prepared the instrument to reflect Uri's and Pola's intent, which was "to provide the surviving spouse full discretion" over the trust estate. In contrast, Lodise testified in support of appellants' interpretation.

We conclude that the trial court properly declined to credit Tangalakis's and Lodise's testimony, for purposes of setting aside the parties' stipulation. As explained above, respondent's interpretation of the instrument cannot be reconciled with its structure and plain language. Furthermore, Lodise's testimony was not cognizable for a different reason, albeit one that is consistent with our conclusion regarding the instrument's proper interpretation: a lawyer's opinion regarding the meaning of a writing that she had no role in creating does not constitute substantial evidence regarding its interpretation. (*Devin v. United Services Auto. Assn.* (1992) 6 Cal.App.4th 1149, 1157-1158, fn. 5; see *Downer v. Bramet* (1984) 152 Cal.App.3d 837, 841*; Elder v. Pacific Tel. & Tel. Co.* (1977) 66 Cal.App.3d 650, 664.)

Respondent also contends that appellants' interpretation of the trust instrument must be rejected because it compels the allocation of Pola's one-half community property interest in the house to the irrevocable exemption trust. She argues that Pola would not have agreed to that allocation, as it required her to give up her rights over the house and potentially constituted a taxable event (see 26 C.F.R. § 25.2511-2(b) [for purposes of federal gift tax, gift is complete when " the donor has so parted with dominion and control as to leave in him no power to change its disposition"]).

This contentions fails in light of the terms of the instrument, which allocate the house to the exemption trust, and are silent regarding the federal gift tax. As explained above (see pt. B, *ante*), our task is limited to discerning Pola's intent from the trust instrument itself. Because the instrument is unambiguous, we will not insert new terms or alter it to reflect an intent not manifested in it, or to address

15

new desires or goals that arise only after its execution.  (*Mummert*, *supra*, 183 Cal.App.2d at p. 199.)  In sum, we conclude that the 1998 trust instrument required the allocation of the house in its entirely to the exemption trust.

## DISPOSITION

The judgment is reversed, and the matter is remanded to the trial court with directions to vacate the judgment and enter a new judgment in favor of appellants, in accordance with this opinion.  Appellants are awarded their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, J.

We concur:

EPSTEIN, P. J.

WILLHITE, J.