Filed 3/24/15  Henry v. Wise CA4/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

KATHY M. HENRY et al.,

      Plaintiffs and Appellants,

v.

CAROLYN L. WISE et al.,

      Defendants and Respondents.

E057073

(Super.Ct.No. RIP095210)

O P I N I O N

APPEAL from the Superior Court of Riverside County.  Thomas H. Cahraman, Judge.  Affirmed.

The Walker Law Firm and Joseph A. Walker for Plaintiffs and Appellants.

Law Offices of Hall & Bailey, John L. Bailey, Therese Bailey-Nelson, and Shannon Duane for Defendant and Respondent Bank of America.

No appearances for Defendants and Respondents Carolyn L. Wise and Margaret Flores.

1

## I. INTRODUCTION

This appeal involves the interpretation of a trust instrument. The subject trust (the Wise Trust) was created by Charles L. Wise (Charles) and Carolyn L. Wise (Carolyn). Charles's separate property, a residence we will refer to as Pick Place, was included in the Wise Trust, as well as certain separate property of Carolyn and the couple's community property. Plaintiffs and appellants Kathy M. Henry and Charlynn N. Wise are Charles's children from a prior marriage and residual beneficiaries under the Wise Trust.[1]

According to the Wise Trust, upon the death of Charles or Carolyn, the "remaining Trust Estate" is to be divided and placed into two new subtrusts: "Trust A" and "Trust B." After Charles's death in 2001, Carolyn, as trustee of the Wise Trust, transferred title to Pick Place into Trust B, where it could be used as security for a loan under certain circumstances. The trustees of Trust B then encumbered Pick Place with a reverse mortgage and used the loan proceeds for Carolyn's health, support, and maintenance. The reverse mortgage was eventually acquired by respondent Bank of America (BofA).

Kathy and Charlynn assert that title to Pick Place should never have been transferred into Trust B. Specifically, they contend that upon Charles's death Carolyn was to receive a life estate in the property from which she could use the property's net income, and they were to receive the remainder independent of the provisions for Trust A

---

[1] Because Charles, Carolyn, and Charlynn have the same last name, we will refer to them by their first names. For the sake of consistency, we will refer to Kathy Henry by her first name as well.

and Trust B. As such, they argue that Carolyn had no power to transfer title to Pick Place into Trust B and, therefore, the trustees of Trust B had no power to encumber it with a reverse mortgage.

BofA does not dispute that Carolyn had a life estate in Pick Place, but contends she could and did validly transfer title to the property into Trust B and that the trustees of Trust B were empowered by the terms of the trust to "invade the principal" by encumbering the whole of the property. BofA further contends that if Kathy and Charlynn's interpretation is correct, the reverse mortgage is still valid because BofA is a bona fide encumbrancer.

The trial court agreed with BofA and construed the trust document to permit the Trust B trustees to encumber the fee interest in Pick Place as needed for Carolyn's health, support, and maintenance.

Reviewing the Wise Trust instrument de novo, we conclude, as the trial court did, that notwithstanding the creation of a life estate in Pick Place, the grantors, by providing for the inclusion of that interest in Trust B, empowered the trustees of Trust B to borrow and encumber the entire interest in the property if certain conditions are met. Because the trial court's findings that such conditions were met are not challenged on appeal, the reverse mortgage held by BofA is valid and superior to the remainder held by Kathy and Charlynn. We therefore affirm the judgment.

## II.  STATEMENT OF FACTS

A.  *The Creation of the Wise Trust and Its Pertinent Terms*

In 1998, Charles and Carolyn, as husband and wife, established the Wise Trust. They were the original trustees of the Wise Trust and referred to in the trust document as "Trustees" and "Grantors."  Upon the death of one of them, the other was to serve as sole Trustee.

The trust estate included property specified as Charles's separate property, property specified as Carolyn's separate property, and property specified as their community property.  The only item listed as Charles's separate property was Pick Place. Carolyn's separate property included certain real property and financial accounts.  The listed community property included certain financial accounts.

The most pertinent provisions of the Wise Trust documents are the following:

"1.024  Distribution of Separate Property:  Upon the death of the first Grantor, hereinafter referred to in this paragraph only as the Deceased Grantor, the Trustee hereof shall make the following distributions:

"A.  If the Husband is the Deceased Grantor, the Trustee is directed to make the following specific distributions of the Husband's Separate Property:

"HUSBAND'S SEPARATE PROPERTY, if not already distributed:

"WIFE to use entire net income of Husband's Separate Property for and during her lifetime, then to:

4

"The balance of the Husband's Separate Property shall be distributed to the following individuals . . . in the following percentages:

"KATHY M. HENRY 50%

"CHARLYNN N. WISE 50% [¶] . . . [¶]

"Distributions of Separate Property to the Surviving Spouse shall be deemed included in the Residue of the Estate for the division of Trust 'A' and Trust 'B.'

"1.025 <u>Division into Trust 'A' and Trust 'B'</u>: Upon the death of the first Grantor, hereinafter referred to in this paragraph only as the Deceased Grantor, the Trustee shall divide the remaining Trust Estate . . . into two (2) parts, which shall constitute separate Trusts and shall be held, administered and distributed as such. Said Trusts shall hereafter be called Trust 'A' and Trust 'B' respectively."

Trust A includes, in part, "the Surviving Grantor's share of the community property and the Surviving Grantor's separate property."

Trust B "shall consist of the balance of the Trust Estate representing the balance of the Deceased Grantor's interest in the Grantors' community property and the balance of the Deceased Grantor's separate property."

Part 1.04 of the Wise Trust governs the distribution of net income and principal of Trust B. Under that part, the "Trustee shall pay to the Surviving Grantor the entire net income of Trust 'B' for and during the Surviving Grantor's lifetime." In addition, under certain conditions, the Trust B trustee is authorized to pay to the surviving grantor or other beneficiary "so much of the principal, up to and including the whole of the

5

respective Trust, as the Trustee may deem advisable . . . ." The conditions include the insufficiency of funds from other sources to provide for the education, health, support, and maintenance of the surviving grantor or beneficiary. Furthermore, payments of principal of Trust B may not be made to the surviving grantor until the principal of Trust A has been exhausted. In addition, payments of principal of Trust B to the surviving grantor can be made only if an "independent Co-Trustee," who has sole discretion regarding distributions from Trust B, is appointed. Finally, "[a]ll Trustees shall exercise their discretion in such a manner as to Trust 'B' so that assets of Trust 'B' will be used primarily for the education, health, support, and maintenance of the Surviving Grantor."

Upon the death of the surviving grantor: "If not already distributed, the balance of the Husband's Separate Property, shall be distributed to the following individuals . . . in the following percentages:

        "KATHY M. HENRY        50%

        "CHARLYNN N. WISE        50%"

In addition to other specified powers, the Trustee has the power "[t]o borrow money for any Trust purpose on such terms and conditions as the Trustee may deem proper; and to obligate the Trust Estate for repayment; to encumber the Trust Estate or any item of property by mortgage, to execute a deed or deeds of trust, to pledge or otherwise use such procedure to consummate the transaction as the Trustee may deem advisable."

6

B.  *Additional Facts*

In September 2001, Carolyn was diagnosed with breast cancer.  Two days later, Charles suffered a stroke and was hospitalized.  He died two weeks later.

Carolyn underwent debilitating radiation treatment, chemotherapy, and other cancer treatments in California and Mexico.  During her treatment, Carolyn was cared for by her daughter.  Carolyn's medical treatment at hospitals in California was fully covered by Medicare and insurance.  Carolyn paid over $40,000 in cash for her treatment in Mexico.  At the time of trial, Carolyn's monthly expenses had been exceeding her monthly income by over $400 for more than a year.

In 2003, Carolyn consulted an attorney to find out if she could take out a loan against the Pick Place property.  The attorney told her that because the assets in Trust A had been exhausted, Carolyn could invade the principal of Trust B by borrowing against Pick Place.

On January, 24, 2004, Carolyn appointed Margaret Flores as an independent cotrustee of Trust B.  The document evidencing the appointment states that it is made "in order for [Carolyn] to invade the trust principal [of Trust 'B'] for her education, health, support and maintenance . . . ."  Flores accepted the appointment.  On the same date, Carolyn, as trustee of the Wise Trust, executed a quitclaim deed transferring "all of her right, title and interest in and to" the Pick Place property to Carolyn, as trustee of Trust B.  The deed was recorded in February 2004.

7

In March 2004, Carolyn, as trustee of Trust B, executed two reverse mortgage deeds of trust, each securing loans in the principal amount of $366,225; one in favor of Seattle Mortgage Company, and a second in favor of the Secretary of Housing and Urban Development. A portion of the loan proceeds from one or both loans was used to pay off an existing mortgage on Pick Place.

Prior to funding the loan on Pick Place, Seattle Mortgage Company obtained a copy of the Wise Trust. Seattle Mortgage Company's loan file for the transaction included a "trust review checklist," and a document titled "Breakdown and explanation of 'B' trust" (Trust Breakdown). The Trust Breakdown contains brief descriptions of paragraphs 1.025, 1.026, 1.04, and 3.011 of the Wise Trust, but makes no specific reference to paragraph 1.024. The loan file also included a letter prepared by Carolyn's attorney in which he stated that he had reviewed Trust B and opined that Carolyn was the current trustee of the trust and authorized to encumber the real property of the trust for a reverse mortgage.

In March 2007, the 2004 reverse mortgages were refinanced and the deeds of trust reconveyed. At that time, Carolyn and Flores, each as Trustee, executed a reverse mortgage deed of trust in favor of Mortgage Electronic Registration Systems, Inc. (MERS), as nominee for Seattle Mortgage Company. In 2011, MERS assigned its interest in the 2007 deed of trust to BofA.

8

C.  *Procedural Facts*

In September 2010, Kathy and Charlynn filed a first amended petition in which they alleged that Carolyn breached her fiduciary duty to them when she "unlawfully invaded the principal of 'Trust B' property" by encumbering the Pick Place property with a reverse mortgage.  They sought, among other relief, rescission of the 2007 reverse mortgage.  The amended petition named Seattle Mortgage Company as a defendant, but not BofA.

In May 2011, BofA filed a complaint against Carolyn, Kathy, and Charlynn, among others, alleging it had acquired the 2007 reverse mortgage against the Pick Place property.  BofA further alleged that Carolyn had the authority under the Wise Trust to encumber the Pick Place property with the 2007 reverse mortgage, and that its interest in the property was superior to Kathy and Charlynn's claims.  BofA sought declaratory relief as to the respective rights of the parties and quiet title, among other claims.

In August 2011, the two actions were consolidated.

Carolyn testified about her understanding of the trust.  She stated:  "[M]y assets, which would have been my bank account and my home, went into the A, and the Pick Place home went into the B."  When asked specifically about her understanding at the time the trust was created as to "what was to be in the B Trust," she answered, "Pick Place property."

9

Carolyn also confirmed that she had stated in a response to written interrogatories about Pick Place: "'I believe I have a life estate in this real property asset, date acquired approximately 2001.'"

Following trial, the court entered judgment in favor of Carolyn, Margaret, and BofA with respect to all relief sought in the probate petition and ordered Carolyn to render an accounting of trust assets to Kathy and Charlynn. The court also found that BofA "has a valid reverse mortgage presently existing against [Pick Place]." The court denied all other relief sought by BofA without prejudice.

In its statement of decision, the court stated that it had "carefully considered the arguments of [Kathy and Charlynn] pertaining to the limited capacity of one holding a life estate to encumber real property," but rejected the argument because it "ignores the specific terms of the trust, which empower the surviving trustor to invade the principal (thus, the fee simple interest) of assets in the decedent's sub-trust for health, support and maintenance. . . . Reasonable minds can differ as to the correct scope of health, support and maintenance, but there exists no intractable principle of real property law, pertaining to life estates or otherwise, that precludes the court from construing and applying the provisions of the trust."

With respect to the trustee's power to invade the principle of Trust B by encumbering Pick Place with the reverse mortgage, the court found that "[a]t all relevant times . . . Carolyn Wise was in financial need, and there was nothing in Trust A for her to use." The court further stated that Kathy and Charlynn "have shown absolutely nothing

10

by way of extravagant expenditure or waste [and] [t]here is no doubt that the loan proceeds were used for reasonable support and medical care, along with necessary maintenance and repair of Pick Place."

Kathy and Charlynn appealed.

### III. DISCUSSION

Initially, it appears from the arguments on appeal that Kathy and Charlynn are not challenging the trial court's findings that the conditions for invading the principal of Trust B had been satisfied. It is thus conceded that Carolyn's income from other sources was insufficient to provide for her education, health, support, and maintenance; the assets of Trust A had been exhausted; and the requirement that an independent cotrustee be appointed was met.

It further appears from the parties' briefs on appeal that they agree that the Wise Trust provided for the creation, upon Charles's death, of a life estate in Pick Place measured by the life of Carolyn, with the remainder held by Kathy and Charlynn in equal shares. As we explain below, if that life estate is included within Trust B, the trustee could encumber "the whole" of the interest in Pick Place and the BofA reverse mortgage is superior to the interest in the remainder. If, however, the life estate passed to Carolyn outside the subtrusts, Carolyn's power with respect to Pick Place is arguably limited to her use of the property's net income; any encumbrance granted by Carolyn would be likewise limited and subject to Kathy and Charlynn's remainder interests.

11

The threshold issue, therefore, is whether the life estate was validly transferred into Trust B.

A. *Standards of Review*

"The interpretation of a trust instrument, like any written document, is a question of law." (*Brown v. Labow* (2007) 157 Cal.App.4th 795, 812.) "'"In construing trust instruments, as in the construction and interpretation of all documents, the duty of the court is to first ascertain and then, if possible, give effect to the intent of the maker." [Citations.]' [Citation.]" (*Estate of Cairns* (2010) 188 Cal.App.4th 937, 944.) The intent of the trustor "'"must be ascertained from the whole of the trust instrument, not just separate parts of it." [Citations.]' [Citation.]" (*Ibid.*) We seek to avoid rendering key phrases as surplusage (*Comstock v. Corwin* (1952) 111 Cal.App.2d 770, 772-773), and interpret the instrument to "'give every expression some effect, rather than one that will render any of the expressions inoperative'" (*Safai v. Safai* (2008) 164 Cal.App.4th 233, 244, quoting Prob. Code, § 21120).

In interpreting a trust document, "it is proper for the trial court in the first instance and the appellate court on de novo review to consider the circumstances under which the document was made so that the court may be placed in the position of the testator or trustor whose language it is interpreting, in order to determine whether the terms of the document are clear and definite, or ambiguous in some respect. [Citation.] Thus, extrinsic evidence as to the circumstances under which a written instrument was made is

12

admissible to interpret the instrument, although not to give it a meaning to which it is not reasonably susceptible." (*Ike v. Doolittle* (1998) 61 Cal.App.4th 51, 73.)

B. *Background Principles Regarding Life Estates*

"A life estate is an estate whose duration is limited to the life of the person holding it or of some other person." (*Estate of Smythe* (1955) 132 Cal.App.2d 343, 345 (*Smythe*); see generally 3 Miller & Starr, Cal. Real Estate (3d ed. 2011) § 9:19, p. 9-36, fn. omitted (Miller & Starr) [A life estate is an interest in real property "measured in duration by the life or lives of one or more persons."].) It is not essential to the creation of a life estate "that the term 'life estate' be used in the instrument creating the estate nor that it be declared expressly to be a life estate if adequate words are used describing its characteristics and showing an intention to vest a life estate." (Miller & Starr, *supra*, § 9:20 at p. 9-38, fn. omitted; see also *Smythe*, *supra*, at pp. 345-346.) When a life estate is created, there usually is a remainder over to a third person or a reversion to the grantor. (Miller & Starr, *supra*, at § 9:19, p. 9-37.)

Generally, the holder of the life estate, or life tenant, has the right to possess and make reasonable use of the land and receive the rents, issues, and profits of the land accruing during the life estate, but not to consume the corpus of the estate. (Miller & Starr, *supra*, § 9:21, pp. 9-43 – 9-44; 12 Witkin, Summary of Cal. Law (10th ed. 2005) Real Property, § 24, pp. 78-79, § 29, pp. 82-83.) Significantly, however, the grantor of "a life estate can alter the correlative rights of the life tenant and the remainder interest holder by express provisions in the instrument." (Miller & Starr, *supra*, § 9:21, p. 9-43,

13

fn. omitted.) Thus, a grant of a life estate may provide the life tenant with the power to use, consume, or dispose of the property, so that only the remaining portion, *if any*, passes to the remainderman after the death of the life tenant. (See generally 12 Witkin, Summary of Cal. Law, *supra*, § 29, pp. 82-83; Miller & Starr, *supra*, § 9:21, p. 9-44.)

These principles are applied in *Smythe, supra,* 132 Cal.App.2d 343. In that case, a will provided: "'All that I possess I give and bequeath to . . . Ruth Smyth for her during her life time, as she may need or see fit to use. If, upon her death, any of my estate remains, it is my will that such remainder be divided equally through her will between [two entities].'" (*Id.* at p. 345.) The Court of Appeal stated that "[a] life estate with power to use and consume part or all of the principal for specified purposes and a limitation over of the remainder on termination of the life estate has long been recognized in this state. [Citation.] Such power of absolute disposition, annexed to a life estate, does not enlarge that estate into an estate in fee." (*Id.* at p. 346.) The court went on to construe the grant as creating a life estate providing the holder of the life estate with the power to "consume[] it all 'as she may need or see fit to use.' . . ." (*Id.* at pp. 352-353.) If she does use it all, the holders of the remainder "get nothing. If she does not, they get what is left." (*Id.* at p. 353.)

C. *Interpretation of the Trust Document*

In arguing that the life estate to Carolyn is not included within Trust B, Kathy and Charlynn rely heavily on a portion of paragraph 1.024 of the Wise Trust. That portion

14

provides, in part: "If the Husband is the Deceased Grantor, the Trustee is directed to make the following specific distributions of the Husband's Separate Property:

"HUSBAND'S SEPARATE PROPERTY, if not already distributed:

"WIFE to use entire net income of Husband's Separate Property for and during her lifetime, then to:

"The balance of the Husband's Separate Property shall be distributed to the following individuals . . . in the following percentages:

"KATHY M. HENRY          50%

"CHARLYNN N. WISE          50%"

This language, read in isolation, does support Kathy and Charlynn's argument. It can be reasonably construed as granting Pick Place (i.e., husband's separate property) to Carolyn "for and during her lifetime." The words, "to use entire net income" indicates that she may not consume or dispose of the property itself, but use only the net income it produces. Indeed, the language is arguably more restrictive than the general rules regarding life estates that the holder of the life estate has the right to *possess the property*, as well as receive the rents, issues, and profits of the property. (See Miller & Starr, *supra,* § 9:21, pp. 9-43 – 9.44.)

The problem with this argument is that the language cannot be read in isolation. (See *Scharlin v. Superior Court* (1992) 9 Cal.App.4th 162, 168 [the trustors' intent "must be ascertained from the whole of the trust instrument, not just separate parts of it."].) Kathy and Charlynn simply ignore the last sentence of paragraph 1.024, which states:

15

"Distributions of Separate Property to the Surviving Spouse shall be deemed included in the Residue of the Estate for the division of Trust 'A' and Trust 'B.'" Because Pick Place was the only item specified in the trust document as Charles's separate property, the words "Distributions of Separate Property to the Surviving Spouse" unambiguously refer to the interest in Pick Place granted to Carolyn in the same paragraph. The life estate in Pick Place, therefore, is clearly not distributed to Carolyn outside, or independent, of the trust, but continues to be part of the Wise Trust estate and subject to placement in Trust A or Trust B.

Because Trust A consists essentially of Carolyn's separate property and her share of community property, and Trust B consists of Charles's share of community property "and the balance of [his] separate property," it is clear that the life estate created in paragraph 1.024 is to be placed in Trust B, not Trust A.[2] Title would thus be held by the trustee of Trust B for the life of Carolyn, with the remainder (if any) to Kathy and Charlynn. The provisions regarding Trust B, as noted above, plainly permit the trustee to invade the principal of Trust B, including encumbering the real property held in trust.

The placement of the life estate in Trust B does not, as Kathy and Charlynn suggest, convert the life estate into a fee interest; thus, Carolyn could not devise the fee interest or dispose of it except as provided by the express terms of the grant. (See

_____

[2] In addition to the surviving grantor's separate property and share of community property, Trust A shall also "include the minimum dollar amount necessary as a marital deduction to eliminate any Federal Estate Tax at the death of the Deceased Grantor . . . ." Neither party contends that this provision would apply to the interests in Pick Place.

16

*Smythe, supra,* 132 Cal.App.2d at p. 346 [the power of a life tenant to dispose of the fee "does not enlarge that estate into an estate in fee."].) It does, however, define the nature of the respective interests. Because the trustee of Trust B has the express power to invade the principal of Trust B "up to and including the whole of the respective Trust," Kathy and Charlynn may ultimately receive nothing. (See *id.* at p. 353.)

We acknowledge that the words in paragraph 1.024 relied on by Kathy and Charlynn and the language in the last sentence of that paragraph are not easily harmonized. The former appears to create a narrow life estate entitling Carolyn to no more than the net income from the property; the latter appears to simultaneously call for the transfer of the life estate to the Trust B trustee with the power to invade the principal. Our conclusion that the grantors intended that the life estate in Pick Place be placed within Trust B is supported by other language in the trust instrument and by Carolyn's testimony.

Under Kathy and Charlynn's interpretation of the document, *all* of Charles's separate property must be distributed independently of Trust A and Trust B. This is because paragraph 1.024 provides for a life estate in Charles's separate property to Carolyn and "[t]he balance of [Charles's] Separate Property" distributed to Kathy and Charlynn. Because the word "balance" in this instance plainly refers to the entirety of Charles's separate property not distributed to Carolyn, there would be nothing left of Charles's separate property for inclusion into Trust A or Trust B. However, paragraph 1.025 of the Wise Trust calls for "the balance of [Charles's] separate property" to be

17

placed in Trust B. The provisions regarding the administration of Trust B in paragraph 1.046 also specify that "the balance of the Husband's Separate Property" is to be distributed to Kathy and Charlynn in equal shares. If Kathy and Charlynn's argument is accepted, these provisions would be surplusage and without meaning or effect. Such a construction is disfavored and should be avoided. (Prob. Code, § 21120.) Finally, our interpretation is consistent with Carolyn's testimony that she understood at the time the Wise Trust was created that Pick Place would be placed in Trust B.

Also, it follows from Kathy and Charlynn's construction that Carolyn could not sell or borrow against Pick Place even if she was destitute, ill, and without other means of support. There is nothing in the record to suggest the grantors intended such a harsh result. Indeed, according to the terms regarding Trust B, the trustee can make payments of principal out of the Trust B assets to beneficiaries, including Kathy and Charlynn, as well as to Carolyn, but is instructed to exercise her discretion "so that the assets of Trust 'B' will be used primarily for the education, health, support, and maintenance of the Surviving Grantor," i.e., Carolyn. This indicates a clear desire to provide first for the needs of the surviving spouse, then, if any is left, to the residual beneficiaries.

During oral argument, counsel for Kathy and Charlynn asserted a new argument— that section 1.024 did not grant a "full blown" life estate in Pick Place to Carolyn, but a grant of only the net income from Pick Place to Carolyn for her life (which would then be placed into Trust B), while the corpus of Pick Place would go to Kathy and Charlynn outside of Trust B. Counsel did not, however, explain how the trustee of the Wise Trust

18

could distribute Pick Place's future net income to Carolyn "upon the death of the first Grantor," as directed. Although an intent to distribute the income to Carolyn and the corpus of the property to Kathy and Charlynn might be carried out by the grant of a life estate to Carolyn as discussed above, Kathy and Charlynn are now rejecting that construction. If a life estate in the property is not used and the property is not transferred to Trust B, it is possible that title to Pick Place could continue to be held by the trustee of the Wise Trust without it being transferred to Trust A or Trust B; that is, it remains in the main trust, not a subtrust. The trustee of the Wise Trust could then distribute net income to Carolyn as it arrives and hold the corpus for the benefit of Kathy and Charlynn. However, in that case, the trustee of the Wise Trust would be entitled to exercise the broad powers expressly provided by that instrument, including powers to sell Trust property, "to encumber the Trust Estate or any item of property by mortgage," and "to borrow money and pledge any Trust assets as security or collateral . . . ." The trustee, i.e., Carolyn, would certainly be empowered to encumber the property with the BofA reverse mortgage under these provisions.[3] The construction of the trust instrument raised during oral argument, therefore, does not help Kathy and Charlynn.

Because we construe the trust instrument as providing for the transfer of title to Trust B, which permitted the trustees to encumber the principal of Trust B "up to and

_____

[3] Another problem with Kathy and Charlynn's new argument is that it renders part of the definition of Trust B surplusage. Trust B is defined to include "the balance of the Deceased Grantor's separate property." According to Kathy and Charylnn's interpretation, however, all of Charles's separate property is distributed outside of the subtrusts, and there would thus be no "balance" to be placed into Trust B.

19

including the whole" interest, the trustees could, and validly did, encumber the whole interest when they executed the 2007 BofA reverse mortgage.[4]

## IV.  DISPOSITION

The judgment of the trial court is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING _____
J.

We concur:

McKINSTER _____
Acting P. J.

CODRINGTON _____
J.

---

[4] Because we reach this conclusion, we need not consider BofA's additional argument that it was a bona fide encumbrancer, as well as arguments concerning the omission of necessary parties on appeal and the statute of limitations.